[Crim. No. 4761. In Bank. Oct. 3, 1947.]

THE PEOPLE, Respondent, v. ARTHUR R. EGGERS, Appellant.

James A. Starritt for Appellant.

Fred N. Howser, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

EDMONDS, J.—Arthur R. Eggers has been convicted of the crime of murder of the first degree and sentenced to death. The proceedings to be reviewed include not only the trial upon the merits, but also the hearing in regard to the issue presented by his plea of not guilty by reason of insanity and the motion for a new trial.

On the morning of January 2d, the headless, handless torso of a woman, wrapped in a blanket and tied with a rope, was found in a ravine off a mountain highway in San Bernardino county. The discovery was given newspaper publicity the same afternoon. Later in the afternoon, or early in the

evening of the same day, Eggers, a clerk employed in the office of the sheriff of Los Angeles County, filed a report stating that Dorothy Eggers, his wife, was missing. According to this report, Mrs. Eggers last had been seen three days before at about 9 a. m.

The body, subsequently identified as that of Dorothy Eggers, had two bullet wounds, one of which penetrated the heart and caused death. The missing head and hands were never recovered.

It appears that at the time of the homicide Eggers and his wife, with two of her young nieces, lived in Temple City, a suburb of Los Angeles. He was assigned to duty in the Temple City substation of the sheriff's office. A room in the back of the house was rented to one Loomis, who had occupied it for more than two years.

Eggers told the jury that his marriage to Dorothy had been a happy one until two years before her death. She then informed him, he declared, that she was starting the change of life and subsequently she had been difficult to get along with. He also mentioned having heard rumors that his wife had gone to dances and picked up men, but because he trusted her he "did not give it much thought."

Just prior to her "disappearance," Eggers and his wife had an argument about Christmas presents. She reproached him for not getting a present for Loomis and called him a "cheap skate," but she "had a mad on." At about the same time, as Eggers related the events, Dorothy told him that the certificate showing ownership of their automobile had been burned accidentally. He obtained an application for a duplicate certificate which he "got her to sign" although "she was reluctant" to do so. The title to the car was in her name, and she also signed a power of attorney, which he prepared, authorizing him to transfer or otherwise deal with the automobile. His explanation of the reason for wanting the change in title was that she had been involved in two accidents and he wished to protect his interest in the automobile if she was "killed or something."

Witnesses other than Eggers testified that they had last seen Dorothy alive on the morning of December 28th. As a witness in his own behalf, Eggers stated that on December 29th he went to work at 5 p. m. and returned home at approximately 1 a. m. on the following morning. As he came near his home, he heard the front door slam and saw a man, after

coming from the house, walk hurriedly down the street. Eggers entered from the rear of the house, and upon turning on the lights found his wife standing without any clothes on in their bedroom.

As he related to the jury what then occurred, he told his wife, "Well, I am going to fix the old Doc from ever coming back here again." He grabbed a gun out of the chiffonier and Dorothy stepped into the hallway to intercept him. He tried to get out toward the front door and she struggled with him. After some struggling, they worked their way to the bathroom. "I was trying to shove her away," he declared, "and she was trying to pull me, and then we both fell in the bathroom, and the gun went off."

According to his testimony, Eggers only remembers one shot. He next found himself "sitting on the toilet seat, crying and scared, and then I know I got in the car, and somebody else was in that car and kept saying, 'She is in back, she is in back.' " But he could not identify the other person. He drove out to Long Beach where he stayed until daylight. He then returned home, went to his bedroom and slept. His explanation as to why, after he shot his wife, he did not get a doctor for her, was: "I do not know whether she was hurt badly, or hurt at all, but I got an idea she was shot, and the next thing I know I was in the car."

Testimony offered by the State shows that the day after the body was discovered, Eggers went to San Bernardino "to look at it." He called at the sheriff's office there, but after some discussion with the deputy in charge, left without viewing the body. Before returning to Temple City, he telephoned to his brother-in-law in Los Angeles, and, being unable to reach him, had the call transferred to his own home where he talked with Loomis. He told Loomis to call the brother-in-law and tell him that the body was not that of Mrs. Eggers because the feet were too large; they "were as big as Garbo's."

He told Loomis he had seen the body, when he had not done so, Eggers explained, because he did not want anyone to know that he had been given the "brush-off" by the sheriff's office. In response to his inquiries, he testified, he was informed that the body could not be that of his wife for it measured 58 inches from the shoulders to the soles of the feet. Eggers said that his wife was 5 feet, 5 inches tall. Upon another occasion he fixed her height as 5 feet, 2 inches. Other evidence tends to prove that she was 5 feet, 7 or 8 inches, in height.

At one time Eggers told the Sheriff of San Bernardino County that the body was that of his wife, and he would claim it for burial, if he were in a position to do so. But, at the trial, he insisted that he believed her to be alive.

On January 4th, Eggers sold his wife's engagement and wedding rings to a jeweler for $10, using an assumed name and giving a fictitious address. His explanation of this action was that he knew his fellow employees in the sheriff's office were suspicious of him, and if his wife's rings were found at his home "it would implicate" him. At one time he stated that he found the rings in a bureau drawer after her "disappearance"; previously he told the officers that he removed the rings from her body after the fatal shot.

One witness testified that on January 3d, she had seen Eggers working on the back of his automobile. He appeared to be cleaning the baggage compartment.

The record shows that two weeks later Eggers sold the car to one of the deputies in his office. The buyer noticed that the registration certificate was in the wife's name and, knowing of the missing person report, he asked Eggers how the car could be transferred without her signature. Eggers replied that she was available and he would get her signature; everything would be all right. Marie, the eldest of Dorothy's nieces living at the Eggers home, testified that he asked her to go to the Division of Motor Vehicles with him and sign her aunt's name to the papers. To comply with this request, she practiced writing Dorothy's name several times, but Eggers finally signed his wife's name to the ownership certificate and obtained another one in the buyer's name. After Eggers was arrested, the certificate showing that the car was owned by Mrs. Eggers was found among her effects.

Expert witnesses testified that although it appeared that the trunk compartment of the automobile had been cleaned recently, small spots of human blood were found in it. Human blood was also found in some grease on the floor of the garage at the Eggers' residence and in the bathroom of the house.

Eggers was arrested on January 22d, and statements were taken from him. In one of these statements he wrote out the directions to follow to find the place where he had thrown his gun and also a saw which, the prosecution maintains, was the instrument used in severing the head and hands from the body.

The blanket in which the body had been wrapped was identified as one belonging to Eggers. The gun and saw were found by following the directions given in his statement. Upon the gun there was a fatty, greasy substance and human blood. There were also numerous bits of tissue, bone and fatty debris. One piece of bone, a rather large fragment, was forcibly wedged between the clip and frame.

A ballistics expert testified that the bullets found in the body of Mrs. Eggers were fired from this gun. The saw bore the initials "A E," which appeared to have been there for some time. Eggers told the jury that he found the gun and saw in the "screen room" at his house several days after his wife had been shot, and because he felt they had been placed there by someone to "frame him" for the murder, he disposed of them.

Upon this evidence, the jury returned a verdict of guilty of murder of the first degree, without recommendations as to the punishment to be imposed. The court then ordered that the issue as to the sanity of Eggers be submitted to the same jury. But before the sanity hearing commenced, the trial judge was informed by one of the jurors that she "had a closed mind" upon the question. And the jury foreman "practically served notice" upon him "that if the same jury were retained it would be a hung jury." The jury was then dismissed and another jury impaneled to hear the sanity issue because, in the judge's opinion, "the members of the jury have disregarded the instructions we gave them about discussing the sanity of the defendant on the first issue." The hearing proceeded notwithstanding the objections of counsel for Eggers, who moved for a mistrial. Following the overruling of objections and denial of the motion, the jury found that Eggers was sane at the time of the commission of the crime.

The judgment is challenged upon four grounds. First, it is contended, the evidence is insufficient to support a conviction of murder in the first degree. Second, the court erred prejudicially to the substantial rights of the accused in instructing the jury. The third point relied upon for reversal is that the procedure followed in impaneling a second jury for the determination of the issue of sanity rendered the trial upon the merits a mistrial and the subsequent hearing a nullity. Lastly, Eggers claims that the argument of the district attorney before the jury was unfair and prejudicial to him in the determination of the degree of the crime.

Several recent decisions of this court are relied upon to support his contention that if his own testimony is not worthy of belief and was disregarded by the jury, then the only proof is that Dorothy Eggers was killed by him, presumably in an unlawful manner. Under such circumstances, he argues, there is not a single fact which affirmatively shows (1) that he shot his wife with malice aforethought (2) that he possessed an abandoned and malignant heart, or (3) that he acted intentionally, wilfully and with premeditation, and he is guilty of no more than murder in the second degree.

Murder is defined as "the unlawful killing of a human being, with malice aforethought." (Pen. Code, § 187.) To constitute murder of the first degree (Pen. Code, § 189) the homicide must have been perpetrated "by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing" or one committed in the perpetration of certain enumerated felonies.

It is "the exclusive province of the jury to determine from the evidence whether the killing was the 'wilful, deliberate and premeditated' act of defendant." (*People* v. *Wells*, 10 Cal.2d 610, 624 [76 P.2d 493].) However, "as is true as to all factual issues resolved by a jury, the evidence upon which the determination is made is subject to review on the question of its legal sufficiency to support the verdict." (*People* v. *Holt*, 25 Cal.2d 59, 90 [153 P.2d 21].) This court may not, in reviewing the evidence, substitute its judgment for that of the jury, and, where there is substantial evidence in support of the jury's verdict, its determination must be upheld. (*People* v. *Holt, supra; People* v. *Smith*, 15 Cal.2d 640 [104 P.2d 510]; *People* v. *Wells, supra; People* v. *Rico*, 180 Cal. 385 [181 P. 663]; *People* v. *Mahatch*, 148 Cal. 200 [82 P. 779].) Conversely, to justify the reversal of a judgment of conviction, the record must clearly show that the evidence could not be interpreted as supporting the verdict. (*People* v. *Tedesco*, 1 Cal.2d 211, 219 [34 P.2d 467].)

Applying these rules, the evidence justifies the conviction of Eggers for murder of the first degree if it shows that the killing was the result of a wilful, deliberate and premeditated intent to kill. But express evidence of a deliberate and premeditated purpose to take· life need not be shown. Deliberation, premeditation and wilfulness may be inferred from the proof of such facts and circumstances as will furnish a reasonable foundation for such a conclusion. (*People*

v. *Smith, supra,* p. 647; *People* v. *Cook,* 15 Cal.2d 507, 514 [102 P.2d 752]; *People* v. *Dale,* 7 Cal.2d 156, 159 [59 P.2d 1014]; *People* v. *Machuca,* 158 Cal. 62, 64 [109 P. 886]; *People* v. *Mahatch, supra,* p. 202.)

■ When there is no direct evidence in regard to the means by which the homicide was accomplished, it does not support a verdict of murder in the first degree unless proof of intent is shown by the surrounding circumstances. ■ No rule can be laid down as to the character or amount of proof necessary to show deliberation and premeditation; each case depends upon its own facts. These elements of murder in the first degree may not be inferred from the killing alone, but are matters of fact, which cannot be implied as matters of law. ■ However, the nature of the weapon used, or acts of malice which, in the usual course of things, would cause death, or great bodily harm, tend to provide a reasonable basis for a conviction of murder in the first degree. ■ In arriving at the intention of the defendant, regard should be given to what occurred at the time of the killing, if indicated by the evidence, as well as to what was done before and after that time. (*People* v. *Cook, supra.*) ■ Here, the record establishes more than the fact that Dorothy Eggers was unlawfully killed by her husband, and from the evidence as to the relations between Eggers and his wife up to the time of the homicide, the type of weapon employed, its condition when found, the means of disposing of the body, the efforts made to prevent identification, and his conduct both prior to and immediately after the crime was committed, the conclusion of a deliberate intention to kill is fairly deducible.

It is only the testimony of Eggers which tends to show lack of premeditation. The jury apparently rejected his explanation of how the killing occurred and in doing so refused to accept the "portions of the evidence as might have tended to show lack of premeditation, when weighed against other evidence adduced to the contrary. The jury was justified in accepting such portions of defendant's testimony as appealed to it, and in rejecting those portions it did not believe." (*People* v. *Smith, supra,* at p. 648.)

Eggers refers to *People* v. *Kelley,* 208 Cal. 387 [281 P. 609], where the crime was reduced from murder of the first degree to manslaughter. But there the decedent "was killed under circumstances tending to show an accidental or unpremeditated killing." (*People* v. *Murphy,* 1 Cal.2d 37, 40 [32 P.2d

635].) The evidence tended to prove that the victim died while engaged in a voluntary debauch with the defendant and the fatal injuries appeared to be the natural result of the orgy. In *People* v. *Howard,* 211 Cal. 332 [295 P. 333, 71 A.L.R. 1385], ''the record was destitute of evidence tending to establish the circumstances and conditions actually existing prior to and at the time of striking the fatal blow'' if the defendant's statement was disregarded. (*People* v. *Mendez,* 27 Cal.2d 20, 29 [161 P.2d 929].) But neither of these cases is here in point because the physical facts and circumstances concerning the death of Dorothy Eggers provide ample evidence from which the jury could conclude, beyond a reasonable doubt, that the killing was wilful, deliberate and premeditated.

 Nine assignments of error are made concerning the instructions to the jury. Eggers first contends that it was prejudicial error to state that every killing perpetrated by means of torture is murder of the first degree. It was erroneous to give a definition of torture, he asserts, because the evidence presented against him is insufficient, as a matter of law, to prove that the death of Dorothy Eggers was accomplished by torture. He does not question the textual correctness of the instruction, but he asserts that the giving of any instruction upon this subject ''amounted to a statement to the jury that there was evidence before it from which killing by torture might be found and made the basis of a verdict carrying the death penalty.'' The evidence does not show sufficient facts, he concludes, from which it can be inferred that Dorothy Eggers died as the result of torture.

 It is error to give an instruction which, although correctly stating a principle of law, has no application to the facts of the case. (*People* v. *Roe,* 189 Cal. 548, 558 [209 P. 560]; *People* v. *Silver,* 16 Cal.2d 714, 722 [108 P.2d 4]; *People* v. *Mandell,* 48 Cal.App.2d 806, 817 [120 P.2d 921].) To charge the jurors as to an issue not predicated upon some theory logically deducible from the evidence presents for consideration a question not properly determinable by them.

 However, the giving of such an instruction does not justify a reversal of the judgment unless it is affirmatively shown that the error would prejudice the rights of the defendant. In the present case, considering his admissions and the evidence tending to prove that the killing was wilful, premeditated and deliberate, the record clearly shows

that the defendant suffered no prejudice. Accordingly, there is no error justifying a reversal of the judgment. (Const., art. VI, § 4½.)

Eggers also argues that the following instruction is misleading and erroneous: "The law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty, for such degree of proof is rarely possible. Only that degree of proof is necessary which convinces the mind and directs and satisfies the conscience of those who are bound to act conscientiously upon it." It is asserted that the use of the word "conscience," in effect, told the jury to "let your conscience be your guide" and ignore the rules of reasonable doubt and burden of proof. The instruction, says Eggers, "leaves the whole decision to conscience." But it has been held that such an instruction, given in conjunction with one defining reasonable doubt, is not erroneous. (*People* v. *Derenzo*, 46 Cal.App.2d 411, 416 [115 P.2d 858].) In the present case reasonable doubt was defined in the language of section 1096 of the Penal Code. The challenged instruction refers to a degree of proof "which convinces the mind and directs and satisfies the conscience." By the two instructions, read together, the jurors were told that each of them must satisfy his conscience as to the guilt of Eggers and be convinced, beyond a reasonable doubt, as to his guilt.

The next assignment of error is the refusal to give an instruction which Eggers concedes was covered by instructions given, but "from a prosecution viewpoint." It is not error to refuse a proffered instruction when the law on the subject is correctly stated in other instructions. (*People* v. *Morales*, 26 Cal.App.2d 442, 444 [79 P.2d 771].)

Complaint is also made of the following instruction which relates to the time for deliberation: "The law does not undertake to measure in units of time the length of the period during which the slayer must deliberate and premeditate or ponder over the killing before he has formed the intent to kill. The true test is not the duration of the time but the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculating judgment may be arrived at quickly. It is for you to say from all the evidence in this case whether or not the defendant premeditated the slaying of Dorothy Eggers, if you find from the evidence beyond a reasonable doubt that he did kill her."

Eggers takes the position that under the law as stated in *People* v. *Honeycutt*, 29 Cal.2d 52 [172 P.2d 698], and *People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8], the instruction was prejudicially erroneous. However, this is not the "repeatedly criticized stock instruction" which, in the Honeycutt case, this court held was erroneous. To say that "thoughts may follow each other with great rapidity and cold calculating judgment may be arrived at quickly" is not the same as saying that one "may premeditate the moment he conceives the purpose." Indeed, the instruction here challenged shows that it was carefully prepared to meet the requirements recently laid down by this court in the Honeycutt and Bender cases. As was said in the Honeycutt case, "the jury may be told that the brain can function rapidly [but] they must not be misled into thinking that an act can at the same time be hasty, hurried, and deliberate or impulsive, unstudied, and premeditated." (*People* v. *Honeycutt*, 29 Cal.2d 52, 60 [172 P.2d 698].) Moreover, "deliberation" and "premeditation" were properly defined in other instructions.

Eggers also complains of the court's failure to give certain instructions which he proposed. One, upon the subject of conjecture or surmise, was sufficiently covered by another requested by him, stating the law in this regard. The same is true as to one relating to the effect of disbelief of the testimony of a witness.

An instruction requested by Eggers to the effect that extrajudicial statements made by him could not be used for purposes of impeachment if they were induced by threats, menace or promises of reward, was also refused. The law in regard to such statements was not stated to the jury, but the evidence did not require it to be included in the charge to the jury. No extrajudicial statements of Eggers amounted to a confession. In fact, he denied his guilt or any connection with the death of his wife until he became a witness in his own behalf, and the rules as to proof of the voluntary character of extrajudicial statements apply only with respect to confessions (*People* v. *Fowler*, 178 Cal. 657, 664 [174 P. 892]) or to statements which include an important incriminating fact. (*People* v. *Nagle*, 25 Cal.2d 216, 223 [153 P.2d 344]). The principles applicable to the extrajudicial statements made by Eggers are fully stated in the general instructions as to credibility of witnesses. Further-

more, his testimony does not show that any of such statements was made because of threats or menace. The promise that if he confessed he would be sent to Mendocino was allegedly made by Jones and Rotchford, two defense witnesses, and the conversations of Eggers with them are not in evidence.

 Eggers also declares that the theory of his defense was ignored by the refusal to give an instruction requested by him concerning killing in the heat of passion or with considerable provocation. But, as he related the circumstances, the shooting was accidental. At no time has he asserted that he shot his wife in the heat of passion or with provocation. The refusal to give the instruction was, therefore, not error, and the instructions given defining voluntary manslaughter sufficiently covered the subject. And, for reasons which have been stated, an instruction directing the jurors that they could not find Eggers guilty of murder in the first degree was properly refused.

Considering the procedure which followed the determination of the issue presented by the plea of not guilty, the record shows an unusual situation. After the trial judge was informed by one of the jurors that she had ''a closed mind'' upon the issue of insanity and the foreman declared that no verdict would be returned if the same jury was retained, the judge called counsel into his chambers. He explained what had occurred and stated that ''in the interest of the defendant, the State and . . . the taxpayers . . . it would be better to dismiss this jury and impanel another one.'' The judge also stated that, notwithstanding the juror's denial, he believed that in deciding the issue of guilt, the question of insanity had been discussed, contrary to his admonitions. Counsel for Eggers objected to the dismissal of the jury, declaring that he would move for mistrial and request a new trial.

The jury was dismissed over these objections. Motions for an order declaring a mistrial and a new trial were denied and a new jury was impaneled to determine the insanity issue. Counsel for Eggers thereupon objected to the introduction of any evidence as to his sanity upon the grounds that the court was without jurisdiction because (1) it had erred in dismissing the former jury and (2) it should have declared a mistrial for misconduct of the first jury. This objection was overruled. Following the presentation of evi-

dence, Eggers was found to have been sane at the time of the commission of the crime.

Counsel does not now press the point that there was any misconduct on the part of the first jury. In fact, he concedes that the trial judge was not justified in concluding that his order to the jurors directing them not to consider the sanity of Eggers had been disobeyed. This position is required by the law. ''The presumption is that the jury performed their duty with fidelity to their oath, and that they observed the admonitions of the judge as to their conduct, and this presumption can be overthrown only by showing some act of positive misconduct.'' (*People* v. *Kramer*, 117 Cal. 647, 649-650 [49 P. 842].) In the face of the positive denial by the juror that the admonitions of the trial judge had been disobeyed, there is no basis for a conclusion that there was any actual, much less prejudicial, misconduct. The motions for a new trial and for an order declaring a mistrial were, therefore, properly denied. (Code Civ. Proc., § 657; Pen. Code, § 1181.)

But a further point urged on behalf of Eggers is that, although there was no misconduct upon the part of the jurors, they were dismissed because of the assumed misconduct. To dismiss the jurors, it is argued, after they were directed to try the second issue, was beyond the court's jurisdiction, and an acquittal is in order since ''jeopardy has attached'' when the jury has been sworn and it stands charged with the deliverance of the defendant.

It is true that the determination of the issues presented by the pleas of not guilty and not guilty by reason of insanity, constitute but one trial. (*People* v. *Marshall*, 209 Cal. 540, 547 [289 P. 629].) But it is a single cause with separate issues to be tried separately (*People* v. *Leong Fook*, 206 Cal. 64, 76-77 [273 P. 779]), and error in the trial of the issue of sanity does not entitle the defendant to a retrial upon the issue presented by the plea of not guilty. (*People* v. *Messerly*, 46 Cal.App.2d 718, 720 [116 P.2d 781]; *People* v. *Mallette*, 39 Cal.App.2d 294, 300 [102 P.2d 1084]; *People* v. *Lamey*, 103 Cal.App. 66, 70 [283 P. 848].) The dismissal of the jury did not, therefore, affect the validity of the determination of guilt. Although judgment cannot be pronounced upon the verdict as to the issue of not guilty until the sanity of the defendant has been determined, the first verdict will

not be set aside upon the basis of alleged ·error occurring after the trial of the first issue is completed. (*People* v. *Marshall, supra*, p. 548.)

██ Section 1026 of the Penal Code authorizes a separate trial upon the issue of insanity and specifically authorizes the court, in its discretion, to retain or dismiss the jury which tried the first action. The direction to retain the first jury is denominated an order (Code Civ. Proc., § 1003) and every court has power to amend and control its orders so as to make them conformable to law and justice. (Code ·Civ. Proc., § 128, subd. 8.) Unquestionably, the trial court was invested with jurisdiction to make an order retaining the jury, and it must be conceded that it has jurisdiction to modify, revoke, or set its orders aside. (*Imperial Beverage Co.* v. *Superior Court*, 24 Cal.2d 627 [150 P.2d 881]; *Harth* v. *Ten Eyck*, 16 Cal.2d 829 [108 P.2d 675]; *De la Beckwith* v. *Superior Court*, 146 Cal. 496 [80 P. 717]; *Burbank* v. *Continental Life Ins. Co.*, 2 Cal.App. 2d 664 [38 P.2d 451]; *Struck* v. *Superior Court*, 138 Cal.App. 672 [32 P.2d 1110]; *City of Los Angeles* v. *Oliver*, 102 Cal.App. 299 [283 P. 298].) The rule as stated in *De la Beckwith* v. *Superior Court, supra*, (p. 499), is as follows: "It is a most common occurrence for a trial court to change its rulings during the progress of ·a trial, upon questions of law, and no one would contend that it is not within its power to do so, or that it should not do so when ·satisfied that the former ruling was erroneous." The ruling that the same jury be retained to try ·the insanity issue occupied no better position in this regard than ·any other determination and, under the circumstances shown by the present record, the court was fully justified in revoking it.

·██ In a supplement to his opening brief, Eggers contends that the trial was so infected with unfairness caused by the prosecution's arguments that the jury was swayed by prejudice in· fixing the degree of the offense. The basis for this conclusion is that the arguments before the jury by the prosecution as to torture were "entirely predicated on the unwarranted theory that pieces of bone were found on the gun"· and this conclusion has no factual basis in the evidence.

· The technical director of the Scientific Crime Investigation Laboratory of the Los Angeles Police Department testified that he found "tiny fragments of bone tissue" as well as deposits of fat, tissue and human blood upon the gun. He

made a spectrographical analysis of a small fragment of the bone "to determine whether or not it contained the elemental constituents of bone." Calcium, magnesium, and borum, and a trace of copper, elements consistent with the composition of bone, were found. He stated that phosphorus was not shown in this analysis, and although phosphorus is present in all bone, he "would have had to use a larger sample" to demonstrate its presence. From this testimony it is argued that the test did not show human bone.

The testimony of the expert was the basis of the argument of the district attorney. "It is the province of a district attorney to state to a jury the various conclusions that he draws from the evidence, and to make it clear to the jury what conclusions in his opinion should be drawn from the evidence introduced, so long as he keeps within the scope of conclusions which may properly be drawn." (*People* v. *McKenzie*, 12 Cal.App.2d 614, 615-616 [55 P.2d 1200].) "The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury." (*People* v. *Sieber*, 201 Cal. 341, 355-356 [257 P. 64].) In the argument before the jury, any reasonable inference may be drawn from the evidence, and it is a matter within the discretion of the trial court to determine whether counsel stays within the permissible range of discussion. (*People* v. *Hoyt*, 20 Cal.2d 306, 318 [125 P.2d 29].) Assuming that, giving effect to these rules, counsel "illogically deduced" that a finding of torture could be inferred from the evidence, at least in the absence of objection, it does not amount to misconduct which has prejudiced defendant's rights.

The judgment and the order denying a new trial are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Schauer, J., Traynor, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied October 27, 1947. Carter, J., Traynor, J., and Schauer, J., voted for a rehearing.