[Crim. No. 15391.   Second Dist., Div. One.   Apr. 17, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ELIAS JAURE-GUI ROMERO et al., Defendants and Appellants.

42

Richard S. Buckley, Public Defender, Seymour Weisberg and James L. McCormick, Deputy Public Defenders, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jeffrey T. Miller, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J. — A jury convicted defendants of robbery (§ 211, Pen. Code) and found that they were armed at the time of the commission of the offense. The trial court ordered stricken that portion of the verdict finding Romero personally to be armed at the time of the robbery. Both defendants appeal from the judgment and order denying motion for new trial. Appeal from the order is dismissed.

Around 1:20 p.m. on October 4, 1967, Mrs. Roach, working at a cash register in Grower's Supermarket, was robbed of $600 in bills; Romero holding a gun told her it was a holdup and Ramirez ordered her to open the cash register drawer. Mr. Siegfried, a clerk, observed the robbery but was unable to definitely identify the robbers.

The following relates to the issue of identification. Having worked for another market and been told to watch for identifying marks in the event of a holdup, Mrs. Roach observed that Romero wore a dark jacket, white dress shirt and felt hat and was about 5 feet 10 and that Ramirez wore a short sleeve maroon shirt buttoned up the front and hanging outside his pants and was 5 feet 10 or 5 feet 11. Ten minutes later she described defendants to police officers—both were of Spanish descent, around 5 feet 9 or 5 feet 10 and Romero had a thin mustache, a thin face, heavy eyes and "a sad look." Shortly thereafter she talked to Deputy Sheriff Allender and told him that Romero, a male Mexican, was 5 feet 9, weighed between 145 and 150 pounds and had a mustache, and that Ramirez was slightly shorter (1 or 1½ inches) but approximately the same weight; the one holding the gun (Romero) was taller. A report taken by Deputy Sheriff Solar on the same day also

contained a description of the two suspects given by Mrs. Roach.[1]

On four separate occasions Mrs. Roach was shown photographs by law enforcement officers. (1) On October 6 around 4 or 5 p.m., before Romero's arrest, Deputy Allender went to the market and showed Mrs. Roach about 10 black and white mug shots from which she identified "both defendants"; later that evening he arrested Romero in a motel room from which he took a color photograph of a group of men and women seated around a table (Exh. A). Deputy Allender was requested by the defendants to and did produce the photographs he had shown to Mrs. Roach on October 6 and on October 10 or 11; he also brought the color photograph (Exh. A) although Exhibit A was not among the photographs he showed to Mrs. Roach. He testified that at no time did he show the color photograph to her although it had been available to other officers. (2) Three days after the robbery (October 7) two police officers (neither of whom was Deputy Allender) came to Mrs. Roach's home and showed her 8 or 10 photographs from which she made no identification. (3) A day or two later (October 8 or 9) two police officers (neither of whom was Deputy Allender) came to the market and showed Mrs. Roach a series of 8 or 10 black and white mug shots of single individuals out of which she picked two that "looked like the ones that held [her] up"; and from a color photograph depicting three men and two women seated around a table (Exh. A) she identified the man "who took the money" (Ramirez) and Romero. (4) On October 10 or 11, Deputy Allender showed Mrs. Roach 10 black and white individual mug shots from which she identified defendants; Exhibit A was not among these photographs.

Mrs. Roach viewed two police lineups—at the first (October 13), there were six men, some of Spanish descent, all dressed in blue, and she recognized Romero in the lineup basing her identification on her observations of Romero during the robbery at the check stand;[2] at the second (October 17), out of

---

[1] "Number 1 Male, Latin descent, early twenties, 5'9", 150 pounds, complexion medium, clothing dark, narrow brimmed hat, charcoal jacket, white shirt." "Second suspect, male Caucasion, Latin descent, early twenties, 5'9", approximately 150 pounds, dark short hair, not crew cut, wearing dirty orange baggy button shirt, dark pants."

[2] On cross-examination: "And you recognized him [Romero] as being the same man you had seen in that particular photograph, is that correct?

"THE WITNESS [Mrs. Roach]: His face, whenever I seen him at the line-up looked just like when he was standing at the check stand. That face I don't think I will ever forget."

six men, some of Latin-American descent, she identified both defendants who were not placed together or at extreme ends but situated in positions like "two and four." She testified that her observations of defendants at the time of the robbery formed the basis of her identification of them in the lineups.

At the trial Mrs. Roach positively identified the two defendants as the men who held her up, and testified "I am, absolutely [sure]. There is no doubt in my mind."

On a motion to suppress Mrs. Roach's identification, Deputy Allender testified that prior to the lineups he advised defendants of their constitutional rights and both signed waiver forms; he took Mrs. Roach to both lineups and admonished her that "a group of people will be brought out upon a stage. We have brought you here to view these people. Possibly the person that held you up is in this group; possibly he is not. We ask you to view this group" and if a person can be identified a card is to be marked. In the first lineup[3] were eight men, all of whom were dark-complexioned, except one with blond hair; in addition to Romero there was one other Mexican-American (Benauvidz); heights ranged from 5 feet 6 to 5 feet 11, four were 5 feet 7 to 5 feet 8. The second lineup[4] consisted of eight men of Latin descent, all dark-complexioned and around 5 feet 5 to 5 feet 9.

At the time of trial Romero, a male Caucasian, 22, was 5 feet 8, weighed 130 pounds and had brown hair and blue eyes; Ramirez, a male Caucasian, 27, was 5 feet 6, 140 pounds and had brown hair and brown eyes.

Defendants did not take the stand but various witnesses offered alibi testimony placing them together at a family gathering at the time of the robbery.

Prior to trial defense counsel advised the court that he would call both defendants as witnesses but for the fact that the prosecutor had evidence that each had suffered a prior felony conviction (Romero—forgery; Ramirez—possession of heroin) and, by objection to the proposed evidence should

---

[3] In the first lineup were Morrison, male Causacian, 24, 5'6", 130 pounds, brown hair and eyes; Franks, male Caucasian, 23, 5'11", 165 pounds, brown hair and blue eyes; Workman, male Caucasian, 21, 5'8", 134 pounds, blond hair and hazel eyes; Benauvidz, male Caucasian, 26, 5'11", 160 pounds, brown hair and green eyes; Romero; and Stewart, male Caucasian, 20, 5'7", 147 pounds, black hair and hazel eyes.

[4] In the second lineup were Ramos, male Caucasian, 19, 5'5", 138 pounds, black hair and brown eyes; Romero; Hermosillo, male Causacian, 25, 5'7", 146 pounds, brown hair and brown eyes; Torres, male Caucasian, 22, 5'5", 131 pounds, black hair and brown eyes; Ramirez; and Resendez, male Caucasian, 21, 5'9", 205 pounds, black hair and brown eyes.

defendants testify, asked the court to exercise its discretion under section 352, Evidence Code to exclude the evidence on the ground that, while admissible for impeachment purposes (§ 788, Evid. Code), its probative value is sufficiently outweighed by the possibility that its admission will create substantial danger of undue prejudice. The trial court overruled the objection on the ground that if defendants testify the prosecution is entitled to impeach their testimony by whatever means are permitted under the Evidence Code which includes raising the prior felony convictions, and that it did not have discretion under section 352 to exclude the evidence.

■ Appellants claim error in the court's refusal to exercise discretion to exclude the evidence which they say deprived them of the opportunity to testify on their own behalf. They argue that the trial court has broad discretion under section 352, Evidence Code,[5] to exclude "any relevant evidence" (§§ 350, 351, Evid. Code) "otherwise admissible" (*Garfield* v. *Russell,* 251 Cal.App.2d 275, 279 [59 Cal.Rptr. 379]), the probative value of which is outweighed by the probability that its admission will create substantial danger of undue prejudice; and that this applies most particularly to evidence of other offenses to prove modus operandi or identity (*People* v. *Haston,* 69 Cal.2d 233, 246 [70 Cal.Rptr. 419, 444 P.2d 91]) and prior felony convictions offered for impeachment purposes. As to the latter we conclude that there is no discretion in the trial court and its ruling was proper. The rule in this state is now (§ 788, Evid. Code) and always has been that any felony conviction is admissible to impeach the credibility of defendant if he takes the stand. (*People* v. *Stewart,* 240 Cal.App.2d 1, 7 [50 Cal.Rptr. 26].) In substance, section 788, Evidence Code, simply restates the rule expressed by former section 2051, Code of Civil Procedure, and thereunder, "For the purpose of attacking the credibility of a witness, it may be shown . . . that he has been convicted of a felony," the exceptions to which (not here applicable) are contained in subdivisions (a) through (d). Appellants' interpretation of section 788 read with sections 350, 351 and 352 allows for a rule of judicial discretion to exclude such evidence and is predicated primarily on the rule and guide-

---

[5]Section 352, Evidence Code: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

lines developed by the United States Court of Appeal for the District of Columbia in *Luck* v. *United States* (D.C.Cir. 1965) 348 F.2d 763 [121 App.D.C. 151]; *Brown* v. *United States* (D.C.Cir. 1966) 370 F.2d 242; and *Gordon* v. *United States* (D.C.Cir. 1967) 383 F.2d 936.[6] However, this is not the law in California (*People* v. *Kelly*, 261 Cal.App.2d 708 [68 Cal. Rptr. 337]. "It [is] the right of the prosecution to attack appellant's credibility as a witness, and for that purpose to show his prior felony convictions." (261 Cal.App.2d at p. 712); section 788, which permits the impeachment of a witness in this manner is not permissive and the trial court has no discretion to exclude evidence of a prior felony conviction on the ground here urged. In *People* v. *Kelly*, 261 Cal.App.2d 708 [68 Cal.Rptr. 337], appellant claimed error and that "It was an abuse of discretion" for the trial court to admit his prior felony convictions to impeach his testimony when he became a witness in his own behalf; and, while the court in the form of appellant's assignment of error concluded that "the trial court did not err or abuse its discretion in receiving this evidence" (p. 713), it is clear from the opinion that the court held that no discretion exists and any felony conviction is admissible to impeach a defendant's credibility if he becomes a witness. "Appellant argues, however, that the language of section 788 is permissive; that the trial court was not required to admit his prior felony convictions in evidence; and that it abused its discretion in permitting these facts to be shown. He cites two cases decided by the Court of Appeals for the District of Columbia, *Gordon* v. *United States*, 383 F.2d 936 and *Luck* v. *United States*, 348 F.2d 763 [121 App.D.C. 151]. The cited cases do lend support to appellant's argument. Indeed, *Gordon* suggests specific guidelines for federal district courts of the District of Columbia to follow in exercising discretion on whether to allow evidence of prior felony convictions for purposes of impeachment. (P. 940.) But these cases do not express our rule." (Pp. 712-713.)

Appellants' next two contentions are based on their erroneous assumption that the "first identification" Mrs. Roach made was on October 8 or 9 from a series of black and white mug shots which included Exhibit A (color photograph) shown to her by two police officers. Thus they claim first that

---

[6]It should be noted that the controlling statute to which these cases refer (14 D.C. Code, § 305) permits impeachment by evidence of one "having been convicted of crime" without making the distinction as in California between misdemeanors and felonies.

the police officers denied them access to the photographs from which Mrs. Roach made her "first identification" and second, that they "presented their photographs for identification in a manner that was unnecessarily suggestive and conducive to an irreparable mistaken identification" in that the color photograph (Exh. A) was included, citing *People* v. *Caruso*, 68 Cal.2d 183, 187-188 [65 Cal.Rptr. 336, 436 P.2d 336], quoting from *Stovall* v. *Denno*, 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967].

As to the first, they argue that since the officers were not witnesses and not identified and the photographs from which Mrs. Roach "first" identified them were never produced in court "material evidence" was denied them. The complaint is hardly worthy of discussion for the record establishes that Mrs. Roach's "first identification" of defendants was *before* Romero was arrested, at the market on October 6 around 4 or 5 p.m. from 10 black and white mug shots submitted to her by Deputy Sheriff Allender (not two police officers) ; and that Deputy Allender testified for the defense and at the request of defense counsel brought to trial all photographs he showed Mrs. Roach (received in evidence as defendants' exhibits). Exhibit A was never shown to Mrs. Roach by Deputy Allender but he nevertheless produced it inasmuch as it was he who obtained it upon Romero's arrest. Thus, it is clear that defendants not only had access to the photographs from which Mrs. Roach first identified them but to Deputy Allender as a witness. Appellants quibble about the date of October 6 as the time she made her first identification by arguing that it is based on the testimony of Sergeant Allender alone and not supported by the testimony of Mrs. Roach; that according to her she first identified defendants from photographs that included Exhibit A and there is no reason to conclude that Sergeant Allender's recollection is more accurate than that of Mrs. Roach. Such an argument ignores the rule on appeal that this court must view the evidence in a light most favorable to the respondent (*People* v. *Sweeney*, 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049]) and assume the existence of every fact in support of the judgment that can reasonably be deduced from the evidence. (*People* v. *Bard*, 70 Cal.2d 3, 5 [73 Cal.Rptr. 547, 447 P.2d 939].) Further, appellants are in error for Mrs. Roach at no time testified that she first identified defendants on October 8 or 9 and she was not questioned concerning the two occasions (October 6 and October 10 or 11) Deputy Allender showed

her the black and white photographs, undoubtedly because he had already testified thereto for the defendants. Moreover, the testimony establishing Mrs. Roach's ''first'' identification of ''both defendants'' on October 6 was given by Deputy Allender, defendants' own witness.

As to the photographs shown to Mrs. Roach by two police officers on October 8 or 9, which appellants erroneously insist is the first time she identified them, neither before nor during trial did they request their production or seek to compel the attendance of the officers as witnesses. (*People* v. *Estrada,* 54 Cal.2d 713, 716 [7 Cal.Rptr. 897, 355 P.2d 641] ; *People* v. *Riser,* 47 Cal.2d 566, 586 [305 P.2d 1].) Inasmuch as Deputy Allender was the investigating officer, had already established at the pretrial hearing Mrs. Roach's first identification of both defendants on October 6 and produced the photographs, made the arrest and conducted the lineup, it is reasonable to conclude that the People felt they had no reason to bring in either the officers or the photographs. In the absence of any effort to secure their production we have no reason to believe that they were ''intentionally suppressed,'' negligently withheld, unavailable or incapable of being produced or would have been denied to defendants; we can only assume that the police, too, have a strong interest in fair identification proceedings and had defendants sought production of the photographs and the officers they would have responded. (See *People* v. *Blackburn,* 260 Cal.App.2d 35, 44 [66 Cal.Rptr. 845].) But the police are under no duty to volunteer either themselves as witnesses or the photographs as evidence. (*In re Imbler,* 60 Cal.2d 554, 569 [35 Cal.Rptr. 293, 387 P.2d 6].) No reason appears from the record and none is suggested for defendants' failure to move during trial for the production of the photographs to which they now claim they were denied access; they may not now take advantage of their want of diligence. (*People* v. *Norman,* 177 Cal.App.2d 59, 63 [1 Cal.Rptr. 699].)

In their second claim that the police presented the photographs in a manner that was unnecessarily suggestive and conducive to irreparable mistaken identification, appellants' statement that they cannot demonstrate the suggestiveness of the manner in which they were ''first identified because they were denied access to the group of photographs from which the identification was made'' of course is untrue; the record establishes that the photographs from which Mrs. Roach first identified them were produced by Deputy Allender

at the trial at their request. No complaint is or can be made of the manner in which these photographs were displayed. Insisting that it was the "first" time Mrs. Roach identified them, appellants take issue with the manner in which the police showed the photographs to Mrs. Roach the *third* time (October 8 or 9) and the *second* time she identified them. Those photographs included 8 or 9 black and white mug shots of individuals and one color photograph of a group seated around a table (Exh. A). From the mug shots she identified both defendants, "Both of them were the front view. They were each one a separate picture," and from Exhibit A she identified defendants as among those seated around the table.

While there is a denial of due process if the in-court identification of a suspect is the result of employment by police officers of suggestive pretrial identification procedures in which the identification of a certain suspect was prompted (*Simmons* v. *United States,* 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967] ; *People* v. *Pedercine,* 256 Cal.App.2d 328, 334-336 [63 Cal.Rptr. 873]), before appellants may invoke the exclusionary concept they must demonstrate the pretrial identification procedure "resulted in such unfairness that it infringed [their] right to due process of law." (*Stovall* v. *Denno,* 388 U.S. 293, 299 [18 L.Ed.2d 1199, 1204, 1205, 87 S.Ct. 1967] ; *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951] ; *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926] ; *People* v. *Haston,* 69 Cal.2d 233, 257 [70 Cal.Rptr. 419, 444 P.2d 91] ; *People* v. *Harris,* 67 Cal.2d 866, 872 [64 Cal.Rptr. 313, 434 P.2d 609] ; *People* v. *Feggans,* 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21].) This appellants have not done, and our examination of the entire record (*Simmons* v. *United States,* 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]) convinces us that (1) the third photographic identification procedure was not so impermissibly suggestive as to give rise to any substantial likelihood of irreparable misidentification; (2) there was no likelihood of mistaken identification for Mrs. Roach knew what defendants looked like long before she identified them from photographs, even the first time; and (3) the in-court identification was based solely on Mrs. Roach's astute observations of defendants during the course of the robbery. As to the third time Mrs. Roach identified defendants, there is no evidence that defendants' photographs were made any more conspicuous than the others (all the record shows is that among them was Exhibit A, even so this was not suspect for

she identified defendants from the black and white mug shots as well as from Exhibit A); that the police in any manner suggested that defendants committed the robbery; or ''that the pictures were used to prime the witnesses to identify defendant[s].'' (*People* v. *Feggans,* 67 Cal.2d 444, 449 [62 Cal.Rptr. 419, 432 P.2d 21].) But the evidence does establish that the inclusion of Exhibit A among the black and white photographs was not conducive to irreparable mistaken identification and the in-court identification was based on a source of knowledge entirely independent of Mrs. Roach's pretrial identification from the photographs. Thus we cannot say that defendants suffered a denial of due process. (*United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *People* v. *Caruso,* 68 Cal.2d 183, 189-190 [65 Cal.Rptr. 336, 436 P.2d 336]; *People* v. *Bonville,* 268 Cal.App.2d 107, 114-116 [73 Cal.Rptr. 741]; *People* v. *Douglas,* 259 Cal.App.2d 694, 698 [66 Cal.Rptr. 492].)

▇ The trial court did not erroneously instruct the jury on reasonable doubt. It read Instructions Nos. 21 and 22[7] (Revised) CALJIC, both of which given in conjunction with each other have been approved. (*People* v. *Eggers,* 30 Cal.2d 676, 688 [185 P.2d 1]; *People* v. *Kennelly,* 166 Cal.App.2d 261, 263-264 [332 P.2d 733].) Appellants claim that CALJIC 22 (Revised) should be laid to rest because it is based on section 1826, Code of Civil Procedure, criticized in *People* v. *Miller* (1916) 171 Cal. 649, 653-655 [154 P. 468], the repeal of which was recommended by the Law Revision Commission and which was ''repealed'' by enactment of the Evidence Code, and it serves no useful purpose, is confusing and when combined with the reasonable doubt instruction vitiates the reasonable doubt standard. This contention has been resolved adverse to appellants in *People* v. *Ray* (July 1967) 252 Cal. App.2d 932 [61 Cal.Rptr. 1], and *People* v. *Hughes,* *(Cal. App.) 72 Cal.Rptr. 828. In *Ray,* the instructions were ''criticized for use of phrases which are meaningless.'' Said the court: ''The former (21 [Rev.]) is prescribed by statute (Pen. Code, § 1096), and the latter, although not requested by defendant, as were the other instructions, has been upheld as

---

[7] ''The law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty, for such degree of proof is rarely possible. Moral certainty only is required, which is that degree of proof which produces conviction in an unprejudiced mind.''

*A rehearing was granted on December 2, 1968. The final opinion is reported in 268 Cal.App.2d 796 [74 Cal.Rptr. 107].

a proper handmaiden to the statutory definition. (*People* v. *Kennelly* (1958) 166 Cal.App.2d 261, 264 [332 P.2d 733].)''
(P. 966.) Later, in *People* v. *Hughes* *(Cal.App.) 72 Cal. Rptr. 828, it was contended that the Instructions Nos. 21 and 22 (Revised) CALJIC ''are 'not in accord with the standards laid down in *People* v. *Hall*, 62 Cal.2d 104, 112 [41 Cal.Rptr. 284, 396 P.2d 700] (1964); where Chief Justice Traynor stated ''To justify a criminal conviction a trier of fact must be reasonably persuaded to a near certainty. The trier must therefore have reasonably rejected all that undermines confidence.'' '' ''*(Cal.App.) 72 Cal.Rptr. 828, 837. The court continued: ''We believe that proof 'beyond a reasonable doubt' and 'to a moral certainty' is the substantial equivalent of proof which reasonably persuades 'to a near certainty.' No intent is indicated by *People* v. *Hall* to impose a higher or different standard of proof in criminal actions than the widely accepted criteria embraced in the trial court's instructions. (See *People* v. *Tober*, 241 Cal.App.2d 66, 72 [50 Cal.Rptr. 228].)'' *(Cal.App.) 72 Cal.Rptr. 828, 831-832.

■ Appellants were not denied effective assistance of counsel under *People* v. *Chacon*, 69 Cal.2d 765 [73 Cal. Rptr. 10, 447 P.2d 106], and *People* v. *Baker*, 268 Cal.App.2d 254 [73 Cal.Rptr. 758], because they were not represented by separate counsel. The point was first raised by defense counsel on motion for a new trial but we have searched the record (*People* v. *Hughes* *(Cal.App.) 72 Cal.Rptr. 828, 830; *People* v. *George*, 259 Cal.App.2d 424, 432 [66 Cal.Rptr. 442] ; *People* v. *Watkins*, 248 Cal.App.2d 603, 606 [56 Cal.Rptr. 734]) and find no indicia of a conflict of interest between Romero and Ramirez, no suggestion that the representation by the public defender was ineffective because of the burden of representing both of them and no injury to either. ■ The fact that a single attorney is appointed to represent two defendants does not in itself mean that either one has been deprived of his right to counsel. Our Supreme Court in *People* v. *Chacon*, 69 Cal.2d 765 [73 Cal.Rptr. 10, 447 P.2d 106], expressly states that the Constitution does not include an automatic right to separate counsel for each codefendant and one counsel may represent more than one defendant so long as the representation is effective. However, in *Chacon* the court found ineffective representation because of a conflict of interest observing

---

*A rehearing was granted on December 2, 1968. The final opinion is reported in 268 Cal.App.2d 796 [74 Cal.Rptr. 107].

that "the record is silent as to evidence that might have been developed on behalf of each defendant had he been separately represented. Nevertheless, the facts of the case are fraught with potentially effective individual defenses." (p. 775); and in *People* v. *Baker,* 268 Cal.App.2d 254 [73 Cal.Rptr. 758], citing *Chacon,* the court said that only where there is no basis in the record for an "informed speculation" that defendant's rights were prejudicially affected can the conviction stand. (P. 256.)　　In the instant case defendants themselves set to rest any speculation as to a separate defense for their witnesses sought to establish the same alibi for each. In *People* v. *Prince,* 268 Cal.App.2d 398 [74 Cal.Rptr. 197], the court quoted from *People* v. *Watkins,* 248 Cal.App.2d 603 [56 Cal.Rptr. 734], which was approved in *Chacon.* " 'The *Odom* decision [*People* v. *Odom* (1965) 236 Cal. App.2d 876 at p. 878 [46 Cal.Rptr. 453]] assembles a useful catalog of the principal situations in which the courts have discerned conflicts of interest: "Conflicts of interest among codefendants may arise when it would profit one defendant to attack the credibility of another [citation]; when counsel would be restricted in final summation because he might injure one defendant by arguments in favor of another [citation]; when one defendant has a record of prior felony convictions and the others do not [citation]; when the defenses of codefendants are factually inconsistent [citation]; or when appointed counsel believes a conflict of interest may exist [citations]." ' (248 Cal.App.2d at p. 606. See also, *People* v. *Perry* (1966) 242 Cal.App.2d 724, 729-730 [51 Cal.Rptr. 740].)" (Pp. 408-409.)

Tested by the above criteria the present case presents no conflict of interest. The theory of the defense was that *both* were together at a family gathering at the time of the robbery, thus it would profit neither defendant to attack the credibiltiy of the other or their alibi witnesses; neither defendant took the witness stand but only because each feared impeachment by evidence of his own prior felony conviction; because he represented both defendants, defense counsel was in no way restricted in final summation to the jury for there were no arguments he could make in favor of one that he could not make in favor of the other; the defense of each was not only factually consistent with the other, but the same; if the jury believed Mrs. Roach, both were guilty, if not, both were innocent; culpability was equal—one held the gun while the other took the money; and neither before nor during trial

did the public defender believe that a conflict of interest existed.

As to Ramirez the judgment is affirmed; as to Romero, the judgment is modified to delete therefrom the following ''and that defendant was armed as alleged''; in all other respects the judgment is affirmed. Appeals from the orders denying motion for new trial are dismissed.

Wood, P. J., and Thompson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 18, 1969.