Filed 4/25/16  P. v. Mansury CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GHAZAL MANSURY,<br><br>    Defendant and Appellant. | D067770<br><br><br>(Super. Ct. No. SCD251282) |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Affirmed.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler , Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Ghazal Mansury guilty of first degree murder (Pen. Code, § 187, subd. (a)) of her mother, Mehria Mansury (sometimes Mehria or victim). The court sentenced defendant to prison for 25 years to life.

On appeal, defendant contends her first degree murder conviction should be reversed because there is insufficient evidence in the record to support the finding the murder was "willful, deliberate, and premeditated." She further contends the trial court erred when it admitted what she contends was unlawful character evidence and when it instructed the jury regarding provocation and the meaning of premeditation. As we explain, we reject each of these contentions and affirm the judgment of conviction.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Prosecution's Case*

At the time of the murder, Mehria lived in a house on Amulet Street in San Diego. When defendant was about three years old, Mehria, her husband Amanullah Mansury (Amanullah) and defendant moved from Kabul, Afghanistan to the United States.

Mehria's niece, Zohra Enayat (Enayat), testified many of Mehria's relatives lived in the San Diego area. Enayat described their families as "very close" and noted they were all involved in each other's "everyday life." Enayat testified that, after Amanullah died in or about 2002, defendant moved in and out of Mehria's house; that whether defendant resided with her mother depended on whether defendant had money and/or had a boyfriend; and that it was defendant's decision whether to live with her mother because Mehria always wanted to be with, and would have "given her life" for, defendant.

Enayat testified that Mehria in the past had asked her and defendant's other relatives to speak to and encourage defendant to take education more seriously and to

2

break free from a lifestyle that defendant admitted included 19 years of sustained methamphetamine use. At the time of the murder, defendant and her boyfriend, Lucio Moreno (Moreno), were living in Mehria's garage. Defendant chose to live in the garage because she wanted to use drugs with Moreno. According to Enayat, defendant and Moreno had moved into the garage after they "lost everything," including property, money, and cars given to them by Mehria.

Enayat noted that in 2013, Mehria became depressed, sad, and lost weight as a result of Mehria's deteriorating relationship with defendant. Enayat described Mehria's house in 2013 as a "disaster," noting there was "junk" and "trash" everywhere and noting the house smelled because defendant was breeding birds in the living room. Because Mehria's house was filthy, Enayat informed her aunt about three or four months before the murder that she no longer would visit in Mehria's house.

According to Enayat, the relationship between Mehria and defendant further deteriorated when defendant's dog attacked and disabled Mehria's dog. Although Mehria was willing to put up with defendant's constant drug use and with defendant's poor treatment of her, Enayat testified Mehria could not take the constant fighting between the two dogs.

Thus, in July 2013—about two months before Mehria went missing—Mehria told defendant that a "friend" wanted to buy defendant's dog. Defendant agreed to sell her dog for $200. Enayat testified that as part of the ruse, she told defendant the "friend" would pay $100 for the dog. Defendant agreed to the sale, and Enayat gave defendant $100.

3

As Enayat was leaving with defendant's dog, defendant became suspicious when Enayat did not take the dog's food and blanket. Enayat and Mehria nonetheless took defendant's dog to the animal shelter. Enayat testified that once at the shelter, they agreed to use Enayat's name to allay Mehria's concern that defendant might harm Mehria if defendant knew her dog had been taken to the shelter. According to Enayat, defendant then was already "abusing" Mehria, including verbally, calling Mehria a "bitch"

Over the next few days, Mehria called Enayat and reported defendant would not let Mehria drive Mehria's new car because defendant somehow had learned they had taken her dog to the shelter, which caused defendant to throw a "tantrum." Defendant retrieved her dog from the shelter and brought it back to Mehria's house. At the time of the murder, defendant remained angry at Mehria for taking defendant's dog to the animal shelter.

Mehria's brother, Tim Arande (Arande), testified he, his wife and their young daughter visited Mehria in the afternoon of Monday, September 23, 2013. During the visit, Arande and his wife noticed Mehria had swelling and puffiness near her right eye. When Arande's wife inquired about Mehria's eye, Mehria told them she had an "allergy." Arande stated both he and his wife suspected Mehria was being untruthful as she appeared "very stressed," unhappy and unwilling to make conversation, despite the fact Arande's wife and daughter were set to travel to Mehria's native country, Afghanistan, the following day.

After Arande dropped off his wife and daughter at the airport the following day, he tried several times to reach Mehria by phone. Initially he called Mehria's "land line" at least four times, but each time he got a "busy signal." He next called Mehria's cell

4

phone at least three times. Mehria did not answer her cell phone, and, unlike many times in the past when Arande had called his sister, on this occasion he was unable to leave a message because Mehria's cell phone just continued to "ring and ring." Arande also was unable to reach Mehria on Wednesday, September 25. Although Mehria's landline rang when he called on Wednesday, nobody answered. However, as before, Arande was unable to leave a voicemail message on Mehria's cell phone.

Worried that he had been unable to reach Mehria for two days, Arande went to Mehria's house on Wednesday, September 25, arriving sometime before 12:00 p.m. He rang Mehria's front doorbell many times, but nobody answered. He also did not hear any barking from Mehria's dog. Arande testified that there was no sign of any activity in and around Mehria's house, even after he called out his sister's name.

Growing more concerned about Mehria, Arande called their sister, Razia Rahim (Rahim). Rahim confirmed she too had not seen or heard from Mehria. Arande learned their other sister, Nasima Salihie, also had been unsuccessful in reaching Mehria. The siblings thus contacted police to " 'find out what [was] going on' " with their sister.

Arande testified about 10 of Mehria's relatives were present at Mehria's house when the police arrived in the afternoon on Thursday, September 26. Arande saw defendant standing outside alone, near the garage door. Arande later saw a man he assumed was defendant's boyfriend come outside from the garage area. Arande was too upset then to speak with defendant because defendant had not told any of Mehria's family members that Mehria had been missing for days.

Arande recalled an incident about a year before Mehria disappeared when he overheard an argument between defendant and Mehria. Arande heard defendant using

5

"bad words" toward her mother, including such words as "bitch" and "fuck" and telling her mother she was "stupid." Arande testified he did not intervene in the argument because his sister was a very private person.

Attorney Mark Classen testified that he prepared legal documents for Mehria in 2005 as part of her estate plan that named defendant as the beneficiary of her trust. After preparing such legal documents, Classen had no further contact with Mehria other than occasionally receiving a "Christmas card" from her.

Classen testified he received a voicemail message from defendant at 8:01 a.m. on September 30 informing Classen that Mehria was missing. Classen called back later that same morning and spoke with defendant. At the time, Classen was unaware there had been "considerable media coverage" about Mehria's disappearance. Defendant told Classen that the "family had been looking for [Mehria] . . . since the previous Tuesday" and that the police had been informed on Wednesday that Mehria was missing. Classen then "note[d] mentally" that defendant's statements about her mother being missing were "devoid of emotion."

Patricia Grace Stahl (Patricia) testified she had known defendant a "few years" when Mehria went missing. Patricia testified she and defendant did "drugs" together, including methamphetamine, and that sometimes she would "crash" at Mehria's house. Patricia described herself and defendant as both "drug addicts."

Patricia testified that on Wednesday, September 25, she and defendant went to lunch and then hung out together; and that later in the day, they went back to Mehria's house so that Patricia could retrieve "some of [her] stuff." While they were driving around in Mehria's car, Patricia asked defendant about Mehria's whereabouts because

6

Patricia had heard about Mehria's disappearance from news reports. Defendant initially told Patricia her "mom was out shopping with . . . friends." Later that day, however, while they were in the car waiting for Moreno, defendant "out of the blue" told Patricia that she had killed Mehria.

Defendant told Patricia key details about the murder. Patricia testified defendant stated that before the murder, defendant and her mother had been arguing; that during the argument, defendant pushed Mehria, injuring her; that defendant became concerned because Mehria had suffered "visible injuries" that "people could see"; that as a result of Mehria sustaining "visible injuries," defendant did not want her mother to go to a prescheduled medical appointment; and that as a result, defendant decided to kill Mehria.

Patricia testified that during this same conversation, defendant stated she used a bicycle inner tube to strangle Mehria; that after strangling Mehria, defendant next found a "blood pressure machine," which showed Mehria had no heartbeat; and that defendant then "dropped off" Mehria's body "somewhere out in Lakeside."

Patricia also testified that before the murder, she saw defendant and Mehria together "[a]ll the time"; that defendant and Mehria were "constantly fighting"; that although Patricia could not understand what Mehria said to defendant (ostensibly because Mehria was speaking in a foreign language), Patricia could understand what defendant was saying to her mother; that Patricia was "blow[n] away" by the things that defendant would say to Mehria; that by way of example only, Patricia heard defendant call Mehria "a bitch, a hag, a whore" and "every name there was in the book"; that Patricia was "offended" by the way defendant often spoke to Mehria; and that the relationship between

7

Mehria and defendant was not the type of relationship a mother and daughter should have.

Dismayed over what defendant had told her, Patricia subsequently called her former husband, Dusty Roswell Stahl (Roswell), and relayed her conversation with defendant. Although divorced, Patricia stated that she and Roswell remained close; that she knew Roswell would do the right thing; and that she was glad Roswell subsequently called "Crimestoppers" about the murder because Mehria had the "right to have peace."

Patricia testified she subsequently received prison letters from defendant. In one of those letters, defendant referred to Roswell and Roswell's new wife as "fucking rats" because they were the ones that had called Crimestoppers regarding Mehria's disappearance.

Beth Bauer (Bauer) testified that she was an occupational therapist and that Mehria was one of her patients. Bauer recalled treating Mehria about three times in 2013 following Mehria's hand surgery. Mehria had a therapy appointment with Bauer set for September 24. However, Mehria did not show up for that appointment. Bauer noted that in her job she was considered a "mandated reporter." As such, Bauer was required to report any evidence of abuse to authorities.

San Diego Police Officer Clinton Leisz testified he and another officer responded to a call made at about 8:30 p.m. on Wednesday, September 25 regarding a missing elderly lady. The reporting party was Enayat and not defendant. When they arrived at the apartment of Enayat's mother (i.e., Rahim), Officer Leisz said they were met by Enayat and several of her family members. After speaking with Enayat, Officer Leisz was directed to defendant, who was also at the apartment.

8

Enayat testified she had gone to Mehria's house at about 6:00 p.m. that same day, and, when she found Mehria was still not home, she quarreled with defendant because defendant appeared "very indifferent" about Mehria's welfare. Enayat further testified Mehria's house that day looked like a "disaster," as there were wet towels everywhere, and, according to Enayat, everything including the sofa in the living room was wet. Enayat told defendant that she was going to call 911 and insisted that defendant follow her back to Enayat's mother's apartment.

As part of his investigation, Officer Leisz obtained a statement from defendant that same night. Defendant claimed she last saw her mother at 8:00 a.m. on Tuesday, September 24. On that morning, defendant said she went into her mother's bedroom, found her mother in bed and obtained the car keys so she could go to work. As part of their investigation, Officer Leisz and another officer next drove to Mehria's house. Defendant followed behind in her own car.

Officer Leisz described the inside of Mehria's house as "disheveled" and "disorganized." They found Mehria's purse, wallet, identification, and cell phone. When Officer Leisz asked defendant about Mehria's cell phone, defendant responded her mother had dropped it in water, and, thus, they had removed the battery to allow it to dry out. However, in his cursory inspection of the cell phone, Officer Leisz then saw no evidence of water damage. As Officer Leisz walked past the bathroom located in the hallway, he recognized an "odor of bleach." On questioning, defendant said she had just recently cleaned the bathroom. Based on defendant's demeanor and the fact defendant had not seen her mother since about 8:00 a.m. the day before *and* had not reported her missing,

9

Officer Leisz then concluded there were "unusual circumstances" regarding Mehria's disappearance.

San Diego Police Sergeant Thomas Sullivan testified he and other officers went to Mehria's house around noon on Thursday, September 26 in response to a missing person report that had been submitted the night before. Sergeant Sullivan estimated there were about 15 family members of Mehria waiting for them. Defendant allowed the officers inside Mehria's house.

Sergeant Sullivan testified that once inside the house, he noticed dog feces everywhere; that although her mother was then missing, defendant acted "somewhat indifferent"; and that on questioning, defendant was unsure where her mother was, although she told police her mother was suffering from dementia and perhaps had "walked away" from the house. Defendant also told police her mother had befriended, or been befriended, by two people defendant did not know.

As Sergeant Sullivan walked down the hallway of the house, he smelled an order of bleach coming from the bathroom. Sergeant Sullivan testified the bleach order was "very noticeable." Inside the bathroom, Sergeant Sullivan saw a bottle of bleach and a pair of white socks in the bathtub. On questioning, defendant told Sergeant Sullivan that her boyfriend had "dirty feet" and had been "washing his socks."

During the walkthrough, Sergeant Sullivan obtained defendant's consent to search Mehria's car, which was parked out front. Inside the car officers found a "steno notepad" with defendant's name on the ledger. The notepad also referenced symptoms commonly associated with dementia.

10

Sergeant Sullivan testified he then concluded Mehria likely had been murdered by one of the people in the house. He testified he arrived at this conclusion because the house was in "complete disarray," but the bathroom was "spotless"; and because when he went inside the bathroom, he saw a "red droplet" on the floor, right next to the door.

Hafizah Shaharyar (Shaharyar) testified that she was very close to Mehria, her aunt; that she typically spoke to Mehria once or twice a week; and that after she learned Mehria went missing, she called Mehria's landline on Thursday, September 26 and spoke to defendant. When Shaharyar asked defendant what had happened to Mehria, defendant stated her "mom used to walk her little dog, the little Chihuahua, and probably she got lost because was developing dementia." When Shaharyar asked if Mehria was home on Tuesday, September 24, defendant claimed to have gone "straight to her [i.e. defendant's] room" after coming home late from "work" that day and that she assumed Mehria was sleeping in her own room. Defendant also told Shaharyar the next day, Wednesday, defendant got up early and went to work. Because Mehria's door was still closed, defendant assumed her mother was still sleeping.

Susan Herrera (Herrera) testified that she and her husband were living in a remote part of East County when Mehria went missing; that because of the remoteness, hardly any vehicles came up the dirt road where they lived; and that because they were "caretakers" of the private property, the property owners instructed Herrera and her husband to stop and ask anybody what they were doing in the area.

At around 9:00 a.m. on or about September 24, Herrera saw a vehicle either parked or moving very slowly on their remote dirt road. Typically, Herrera would have stopped and spoken to the driver. Herrera testified she did not do so that day because she

11

was running late for a doctor's appointment and because she saw the driver was a "middle-aged woman" who "didn't look like [she] was . . . going to do any trouble."

Herrera testified she looked intensely at the woman driver as they slowly passed each other in their cars. From a distance of about four feet, Herrera noted the woman was probably in her 40's, had dark brown hair pulled back in a bun and had a "Middle Eastern look" as a result of what Herrera described was a "very profound jaw line." As they passed, Herrera testified the woman driver did not turn to look at Herrera directly, which Herrera then found "very unusual."

Herrera testified a few days later she saw a news report about a missing woman. In that report, Herrera saw a person who looked "exactly like" the woman she had seen days earlier on the dirt road. Herrera noted even some of the clothing worn by the woman on the news report was "astonishingly the same" as the clothing worn by the woman Herrera had seen driving on the dirt road. Herrera contacted police. Herrera identified defendant in court as the woman driver she saw on the dirt road on or about September 24.

William Sykes (Sykes) testified he spoke with defendant sometime between 11:00 a.m. and 12:30 p.m. on Tuesday, September 24, while they were both doing volunteer work in a church kitchen. On that particular day, Sykes recalled defendant was "somewhat distraught" and was "sad and … angry at the same time." Defendant that day shared with Sykes that she did not like her relationship with her mother, as they were arguing "all the time" and it really had defendant "down."

That same day, defendant told Sykes and other church volunteers that her mother was missing; that the police were investigating; and that she was a suspect. However, as

12

noted *ante*, the police were not notified of Mehria's disappearance until the following day (i.e., Wednesday, September 25).

Tin Bach (Bach) testified that he was working as the director of surveillance at an Indian gaming casino at the time Mehria disappeared; that through a player's club card, the casino could electronically track when a certain player's card was being used at the casino; and that the casino offered rewards to players using a player's club card. Bach further testified that a person needed an acceptable identification card to obtain such a card.

Bach noted that defendant's player club card was used at the casino at about 4:30 a.m. on Wednesday, September 25. Bach further noted that before September 25, the last time defendant's player's club card had been used in the casino was November 3, 2012.

As part of their investigation, police on September 28 found a laptop in the trunk of Mehria's car. Sergeant Richard Pechin testified he performed a forensic examination on the laptop's hard drive. Sergeant Pechin found two "user accounts" for the laptop, one belonging to Mehria and another to defendant.

With respect to Mehria's account, Sergeant Pechin found the last login was likely on September 13, 2013. He also found no "significant activity" in connection with this account between September 13 and September 28, the date when he took possession of the laptop from San Diego Police Detective Tim Norris.

The same was not true for defendant's user account. Using various tools, Sergeant Pechin found under defendant's account that in the evening of September 25, various Internet searches had been run on the laptop from the Wi-Fi network of a fast-food restaurant located on Fairmount Avenue in San Diego. One such search was "CS Info, re

13

Bloodstains," which search was subsequently repeated a minute later. Another search connected to defendant's account was for "homicide investigat[ion]." Sergeant Pechin found several of these same searches were also run on local media websites.

Sergeant Pechin independently used the search terms "CSI re Info Bloodstains" and found it connected to a website that discussed "blood stain pattern and analyses, the different bloodstain pattern, splatter pattern, [and] things like that." He also checked other websites with similar content that had been generated in response to the searches done under defendant's user account, including "Practical Homicide.Com" and "Crime Scene -- Forensics.Com."

Sergeant Pechin testified defendant's user account was also used that same evening to search the San Diego County Sheriff's website related to jail inquiries. One such search was for a person with the last name "Moreno," first initial of "L," and another with the last name "Stahl," first name "Roswell." In analyzing the laptop, Sergeant Pechin also found email from two accounts associated with defendant.

San Diego Police Detective Tracy Guaderrama testified she along with other officers went to Mehria's house on Thursday, September 26 to conduct an initial consensual search of the property. Like the other officers, Detective Guaderrama found Mehria's house to be "very messy" except for the bathroom off the hallway, which Detective Guaderrama described as being "very, very clean, very white [with] a very strong chemical smell" associated with "cleaning supplies."

About *an hour* after Mehria's body was found on October 2, police obtained a warrant to search Mehria's house. Detective Guaderrama testified that once inside the house, they found Mehria had a landline phone, but the portable part of the phone was

14

missing.  When one of Mehria's sisters previously had asked defendant why the "house phone" had been pulled away from the wall, defendant claimed the phone was not working.

During execution of the warrant, officers also found a bottle of bleach located in a trashcan in the kitchen area; foot impressions that were illuminated by Luminol testing in the hallway leading to the master bedroom; blood in the "alcove area" of the living room again illuminated by Luminol testing; carpet cleaner on the coffee table in the front living area; a " 'barbecue skewer' " in the "spare bedroom" that was used to stir paint; a paint can, a roller and two ladders in the hallway and in the living and bedroom area; and kitchen trash bags and a latex glove, turned inside out, in the master bedroom.

In the alcove area of the house, police found a notepad.  On the notepad was writing about "credit cards."  According to Detective Guaderrama, there also was a "question mark about 'Own credit card.  Own insurance,' with a question mark.  And then underneath that it says, 'In the event of disappearance/death.'  So it's an itemized list of maybe questions that somebody had currently with the disappearance and ultimate discovery of Mehria."  Detective Guaderrama noted underneath that list was a reference to a funeral, which included notes about how to bear the costs of one, guests who might attend and an approximate time for the service.

On that same page, Detective Guaderrama noted there was a reference to social security, and further noted that "somebody received direct deposit [of] social security by the 5th."  Underneath the social security reference was the notation, " 'Juan's rent.' " Detective Guaderrama testified "Juan" was a tenant who had rented an unattached unit on Mehria's property.  After the reference to Juan was the notation, " 'Cash by the 5th.' "

15

Juan Garcia (Garcia) testified he rented the unattached unit in June 2013 because his job required him to be in San Diego during the week, although his family lived in Los Angeles. Garcia testified he paid $550 per month for the unit and that when he initially rented it, Mehria made it "very clear" he was not to give the rent money to anybody other than her. Garcia stated defendant called his cell phone at about 5:00 p.m. on October 2—shortly before the police executed the warrant—and left a voicemail message asking him to pay the rent money directly to her. Garcia felt uncomfortable by defendant's request because Mehria was missing and because Mehria had instructed him not to give the rent money to anybody else.

Detective Guaderrama testified they found multiple, visible red stains on a green chair that Mehria regularly used, on mail near the chair and on the walls in or about the alcove. DNA testing showed it was Mehria's blood. Police also found Mehria's blood in the trunk of her car and, using Luminol testing, evidence suggesting the molded plastic panel inside the trunk, next to the trunk latch, had been cleaned. In addition to finding a laptop computer (as noted *ante*) and parts of a bicycle, including bicycle inner tubes, police also found cleaning products and trash bags in the car.[1]

San Diego Police Department Criminalist Coral Luce (Luce) testified the pattern of blood stains on the mail and on the walls in the alcove was consistent with impact spatter. Luce opined that, given the evidence of such impact spatter, Mehria likely sustained at least "one blood-letting injury in the living room/dining room area."

---

[1] During the search of Mehria's house, police found a receipt in defendant's possession from a large retailer dated "9-24-2013" for a purchase made at "2008," or 8:08 p.m. The receipt shows the items purchased included 30-gallon trash bags, bird and dog food and cleaning products including bleach.

16

San Diego Police Department Detective Maura Parga testified a search for Mehria began around dusk on Thursday September 26. Initially searchers focused on a "nine-to-ten-square-mile radius" near Mehria's house. Several members of Mehria's family, but not defendant, as well as myriad volunteers joined in the search over the next few days. The fact defendant did not join in the search or even report her mother missing was a "red flag" for Detective Parga.

Based on information received during the investigation, ostensibly as a result of information provided by Roswell, police on October 2 refocused their search efforts to the Lakeside area, specifically at the bottom of Wildcat Canyon Road. About 4:00 p.m. that day, a volunteer found a badly-decomposed body in a gully in a rural area behind an Indian gaming casino that was determined to be Mehria.

Olivia Gomez (Gomez) testified defendant sometimes would pawn items at the pawnshop where Gomez worked and that on occasion, Gomez would watch defendant's dog while defendant volunteered at a church. On Thursday, September 26, defendant brought her dog into the pawnshop to visit with Gomez. Defendant told Gomez that she had just gotten her "puppy" back from the pound and that the "bitch" had been the one who had taken the dog to the pound. When Gomez asked defendant, " 'What bitch?' " defendant responded, " '[M]y mom.' " Gomez testified that defendant was "upset" about the dog and that defendant did not say anything about her mother's disappearance. Gomez learned the following day that defendant's mother was missing.

Defendant along with another individual returned to Gomez's pawnshop about 11:00 a.m. on Wednesday, October 2. Defendant carried a box that she asked Gomez to keep. Defendant told Gomez that she was going downtown for "questioning" and that if

17

"they" kept her, the contents of the box could be used for her "defense." Defendant also told Gomez that the box contained jewelry belonging to defendant and her mother; that her mother was missing; and that the police believed defendant " 'had something to do with her death.' " A short time later, a San Diego Police Detective came into the pawnshop and took possession of the box. Police arrested defendant on October 3.

B. *The Defense Case*

Defendant testified in her own defense. She stated that she moved in with Mehria in February 2013, after being homeless for about two years; that she used methamphetamine "[a]ll day, every day, every few hours"; and that she lived in the garage of her mother's house with her then boyfriend, Moreno, because they were using drugs.

Defendant testified that on Tuesday, September 24, after awakening and using methamphetamine, she went into Mehria's bedroom about 8:00 a.m. to get the car keys; that after obtaining the keys and using more methamphetamine in the garage, she went back inside the main house to use the bathroom off the hallway; that unbeknownst to defendant, Mehria was standing behind the bathroom door; that when defendant opened the door it hit Mehria in the "butt," knocking her mother down; and that because Mehria was then in the process of undressing, her mother was off balance and thus fell forward, hitting the side of her head on the bathroom sink. After falling, Mehria said she was " 'fine' " and even asked why defendant was still at home. Although Mehria was on her knees, defendant testified her mother showed no visible sign of injury and was not bleeding. Not wanting to upset her mother, defendant testified that she left in the car about 8:20 a.m.

18

Defendant testified that she next drove around a while looking for her boyfriend with the intention of using more methamphetamine; that when she did not find him, she went to the church to volunteer; and that she went home around 12:00 p.m. to check on Mehria.

When defendant arrived home, she found Mehria curled up on the floor in the bathroom off the hallway. Defendant picked up Mehria's hand, found it was "cold and clammy" and found Mehria had no pulse. According to defendant she then " 'freak[ed] out,' " went into the garage and used more methamphetamine. Defendant then left the house because she "needed to get back to work."

After going back to work for a few minutes, defendant testified she next went looking for Moreno for "help" and "support." Eventually they found each other about 4:30 p.m. that same day. According to defendant, she and Moreno were then joined by two other friends. The four of them drove to Mehria's house.

Defendant testified Moreno and their two friends started "clean[ing] up the bathroom" around 6:30 p.m. )! while defendant was in the garage crying. Later that evening, Moreno told defendant to back up the car into the driveway. They then put Mehria's body into the trunk of the car. Before closing the trunk, defendant testified she kissed her mother. With defendant driving, the four of them went to East County, per Moreno's instruction. Defendant said the "plan" was to "find somewhere to put [Mehria's] body" to cover up her death.

Because defendant was distraught, she testified she had Moreno drop off her and one of their friends at an Indian gaming casino while Moreno and their remaining friend "t[ook] care" of the body. On questioning, defendant testified "tak[ing] care" of the body

19

meant Moreno would "bury[] [Mehria]."  Although in "shock," defendant testified she again used methamphetamine.

Defendant testified she was not comfortable reporting her mother's death to police; that she called her mother's estate attorney because she felt she should let "somebody know" that Mehria "was *missing*" (italics added); and that she called Garcia, the tenant of the unattached unit on her mother's property, because she "needed the money" to "survive."  When questioned why she did not call for help, defendant testified the phone had stopped working the night before.  When questioned why she did not reach out to her many family members, defendant stated they would have accused her of killing Mehria.

When asked about the testimony of Patricia that defendant admitted to strangling Mehria with a bicycle inner tube, defendant explained "Trish" was "freaked out" because she was at the house with the rest of the group after Mehria died and perhaps "Trish" was concerned that "maybe she would get blamed for mom's death."  The record shows defendant also was asked about the purchase of bleach and about why she lied to family members and the police regarding the whereabouts of her mother.  Defendant stated she was "always doing laundry and cleaning" and she was afraid.

On cross-examination, defendant admitted she wrote on a notepad that she was " 'Going stir crazy being cooped up here with the bitch bugging me every four and a half minutes."  Defendant also admitted she wrote on a notepad, " 'How to get the bitch committed/evaluated against her will" and " 'How to get the bitch committed.' "  Defendant stated she wrote about committing Mehria because her mother was developing dementia and because her mother refused to be evaluated for the disease.

20

DISCUSSION

A. *Sufficiency of the Evidence to Support First Degree Murder Conviction*

1. <u>Guiding Principles</u>

" ' "[P]remeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." [Citation.]' [Citation.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]' " (*People v. Lee* (2011) 51 Cal.4th 620, 636 (*Lee*).)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), our high court determined that evidence sufficient to sustain a finding of premeditation and deliberation generally falls into three basic categories: "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; [and] (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant

21

must have intentionally killed according to a 'preconceived design' to take his [or her] victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)."

The *Anderson* court noted that "[a]nalysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Anderson*, *supra*, 70 Cal.2d at p. 27.) Also, the court later explained in *Lee* that the three *Anderson* factors " 'are not exclusive, nor are they invariably determinative. [Citation.] " '*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse.' " ' " (*Lee*, *supra*, 51 Cal.4th at p. 636.)

When a defendant "challenges the sufficiency of the evidence, ' "[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citations.] 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " ' " (*People v. Clark* (2011) 52 Cal.4th 856, 942–943 (*Clark*).)

Furthermore, as the reviewing court we need not conclude there was evidence beyond a reasonable doubt to support the verdict. Rather, the test is "whether, after

22

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  We affirm the conviction "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' "  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

2.  <u>Analysis</u>

Defendant contends there was insufficient evidence in the record to support the finding of willful, deliberate, premeditated murder.  We disagree.

Here, we conclude there is substantial evidence in the record to support a finding of planning activity by defendant in connection with Mehria's murder.  Arande testified that *the day before* the murder, both he and his wife observed puffiness and redness near Mehria's right eye, which Mehria then blamed on an "allergy."  Arande noted that his sister that day seemed unusually stressed, unhappy and depressed and that neither he nor his wife believed Mehria's allergy explanation.  This evidence supports a finding that the constant fighting between defendant and Mehria had turned physical.

What's more, Patricia testified defendant admitted that *on the day of* the murder, defendant and Mehria had argued and that during this argument, defendant became physical with her mother.  This finding is further supported by evidence of Mehria's blood, which was found spattered in or in close proximity to the alcove, near the living room, including on Mehria's favorite green chair, on mail located nearby and on the walls.  Criminalist Luce testified at least one blood-letting event involving Mehria occurred in the alcove area.

23

Significantly, Patricia also testified that after Mehria sustained "visible injuries" on the day of the murder, defendant admitted she *then* decided to kill Mehria because she did not want her mother showing up injured to a medical appointment. Bauer, an occupational therapist, confirmed in her testimony that Mehria failed to show up for her 11:30 a.m. medical appointment and that had Mehria shown up with "visible injuries," Bauer as a "mandated reporter" would have been obligated to notify the authorities.

But there's more. Patricia also testified that after defendant injured Mehria, defendant then used a bicycle inner tube to strangle her mother.[2] The record shows that Moreno often worked on bicycles and that there were a "large number" of bicycle inner tubes in the garage. The police also found bicycle inner tubes in Mehria's car. This evidence further supports a finding of planning activity.

Although we conclude the record contains strong evidence of planning activity (see *Anderson*, *supra*, 70 Cal.2d at p. 27), we nonetheless also conclude it contains substantial evidence from which a jury could reasonably infer a "motive" to kill that would in turn support an inference that Mehria's killing resulted from a " 'careful thought

---

[2] We note that, due to the condition of the badly-decomposed body, which also had been ravaged from both the inside and the outside by animals and insects, pathologist Jacquelyn Morhaime was unable to determine the exact cause of death of Mehria. The pathologist nonetheless opined Mehria's death was a homicide, a finding defendant does not directly challenge on appeal. The pathologist testified that, because the skin around Mehria's neck was hardened, leathery and very dark and discolored, and because insect activity in Mehria's oral cavity had caused some of the soft tissue in the neck area to be disrupted and "fall apart," it was "almost impossible" to determine whether Mehria had suffered any recent soft tissue injury in the neck area. The pathologist also testified that while no injuries or marks were found in the victim's neck area, that did not "mean that an injury of the neck didn't occur . . . [i]t just mean[t] that [she] was not able to see it with the degree of decomposition changes that were present." The pathologist also testified it was possible to strangle a victim with a wide, soft surface like a bicycle inner tube and not fracture the victim's neck or leave other indications of strangulation.

and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' " (see *ibid.*). Such evidence included not only defendant's concern that she would be implicated *if* Mehria went to her medical appointment with "visible injuries" inflicted by defendant (see *People v. Hovarter* (2008) 44 Cal.4th 983, 1019 (*Hovarter*) [noting a " 'rational trier of fact could have determined that defendant's motive in murdering [the victim] was to avoid detection' " for the crimes committed against the victim]), but also evidence that defendant *hated* her mother and that their relationship was deteriorating.

In fact, there is ample evidence in the record, including from the testimony of Enayat, Arande, Sergeant Sullivan, Gomez and Patricia, that defendant frequently referred to Mehria as "bitch" and "fucking bitch" among other names, when she spoke of, or wrote about, her mother. Defendant on cross-examination admitted she wrote on a notepad that she was " 'Going stir crazy being cooped up here with the bitch bugging me every four and a half minutes' " and that she also wrote, " 'How to get the bitch committed/evaluated against her will' " and " 'How to get the bitch committed.' " The record shows defendant also frequently told her mother she hated her.

We conclude a jury could reasonably infer from this evidence—and from the evidence that even *after* Mehria went missing, defendant was still angry and complaining about Mehria taking defendant's "puppy" to animal control—a motive that supports an inference that the killing was the result of a " 'pre-existing reflection' " rather than " 'rash impulse.' " (See *Anderson*, *supra*, 70 Cal.2d at p. 27.)

We also conclude there is evidence in the record to support a finding that defendant murdered Mehria for financial gain. The record shows defendant and her

boyfriend moved into Mehria's garage after they had "lost everything" and after defendant admitted they were homeless for about two years. The record also shows that defendant admitted using methamphetamine "[a]ll day, every day, every few hours" for 19 years; that defendant "worked" as a volunteer at a church a few hours per week; that before Mehria's body had even been found, defendant called Attorney Classen, who in 2005 had prepared Mehria's estate plan naming defendant as the beneficiary of Mehria's trust, informing him Mehria was "missing" (but not dead), despite the fact defendant neither informed family members nor the police of Mehria's disappearance; that in the alcove area of the house where Mehria's blood was found spattered, police found a notepad that included notations regarding insurance, credit cards, social security and rent Garcia paid to live in the unattached unit on Mehria's property; and that when Garcia rented the unit from Mehria in June 2013, she specifically instructed Garcia that he was *not* to give the rent money to anybody other than Mehria. Such evidence, and the inferences to be drawn from it, is sufficient for a reasonable jury to infer defendant's motive for the killing was for financial gain, rather than the result of some " 'rash impulse.' " (See *Anderson*, *supra*, 70 Cal.2d at p. 27.)

We also conclude the *manner* of the killing, in this case strangulation with a bicycle tire inner tube, also supports a finding of deliberation. (See *Hovarter*, *supra*, 44 Cal.4th at pp. 1019-1020 [noting that death by ligature strangulation requires a "prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act"].)

26

Finally, although postcrime evidence alone is insufficient to establish that a defendant acted with premeditation and deliberation, such evidence may be probative of a defendant's mental state before and during a crime. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) Relying on postcrime evidence, defendant contends the record shows her behavior after Mehria's death was like " 'someone horrified and distraught about what [s]he had done, not someone who had just fulfilled a preconceived plan.' "

However, this contention essentially requires this court to reweigh the evidence and evaluate the credibility of witnesses, while ignoring the substantial evidence standard in which we review the whole record *in the light most favorable to the judgment* to determine whether it includes sufficient evidence such that a reasonable jury could find the defendant guilty beyond a reasonable doubt. (See *Clark*, *supra*, 52 Cal.4th at p. 942; see also *People v. Crittenden* (1994) 9 Cal.4th 83, 139 [noting under a substantial evidence standard we presume the existence of every fact supporting the judgment that the jury reasonably could have deduced from the evidence, and a judgment will be reversed only if there is no substantial evidence to support the verdict under any hypothesis].)

Here, the evidence in the record shows that after defendant killed Mehria, defendant retrieved a blood pressure monitor and verified her mother was dead. In our view, such evidence amply supports a finding that Mehria's killing was the result of cool and calm reflection, rather than a rash or impulsive act.

However, the record also shows a woman matching the description of defendant was seen driving about 9:00 a.m. on September 24 in a very remote part of East County. A reasonable jury could infer from this evidence that defendant was either in the process

27

of looking for a remote location to "take care" of her mother's body, or she was then in the process of "taking care" of her mother's body, inasmuch as Mehria was ultimately found several days later in a culvert in a remote part of Lakeside.

In addition, the record shows that in the evening of September 25, several Internet searches were conducted at a fast-food restaurant using a laptop found in Mehria's car. These searches were all done under defendant's user account and included websites discussing homicide investigations, blood stains, spatter and analyses. Several similar searches were also run on local media websites, again from defendant's user account, as were searches on the San Diego County Sheriff's website for jail inquiries, including for a person with the last name "Moreno" and first initial "L" (i.e., defendant's then boyfriend).

We conclude this postcrime evidence, particularly when considered in light of the other evidence summarized *ante* and the evidence that the bathroom off the hallway was clean and contained a strong odor of bleach the day after Mehria went missing, in contrast to the rest of Mehria's house, which multiple witnesses described as then being dirty and untidy, further supports a finding that Mehria's killing was the result of cool and calm reflection, rather than a rash or impulsive act. (See *People v. Eggers* (1947) 30 Cal.2d 676, 686 (*Eggers*) [noting the "means of disposing of the body, the efforts made to prevent identification, and [the defendant's] conduct both prior to and immediately after the crime was committed" supported the jury's conclusion that the crime was premeditated and deliberate]; compare *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1267-1269 [noting the lack of *any* planning and motive evidence to support a finding the defendant willfully, deliberately and with premeditation killed his girlfriend after the defendant testified a gun his girlfriend was pointing at him accidently discharged when

28

he "slapped" it out of her hand, and noting the defendant's behavior "following the shooting [was] of someone horrified and distraught about what he had done, not someone who had just fulfilled a preconceived plan," inasmuch as the defendant tried to resuscitate his girlfriend, directed his brother to " 'call the cops' " and defendant could be heard crying in the background during the 911 call].)

That defendant testified in her own defense that she accidently injured Mehria on the morning of September 24 when opening the door to the bathroom off the hallway and that when defendant left the house, Mehria was not only alive, but said she was " 'fine,' " does not change our decision in this case. As the fact finder, the jury was entitled to accept defendant's testimony; by the same logic, however, the jury also was entitled to reject her testimony, as turned out to be the case here. (See *People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*) [a court of review is bound to accept the factual and credibility determinations of the trier of fact].)

We similarly reject defendant's contention that Patricia's testimony regarding defendant's admission of strangling Mehria with a bicycle inner tube was insufficient to allow a reasonable jury to conclude defendant committed first degree premeditated murder. As already noted, it was up to the jury to determine what weight, if any, to give to Patricia's testimony. (See *Smith*, 37 Cal.4th at p. 739.)

In any event, we note that Patricia's testimony was not so inherently improbable, unreliable or incredible that it could not be used as the basis to support a finding of premeditation and deliberation. (See *People v. Young* (2005) 34 Cal.4th 1149, 1181 [noting that "unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction"].) Indeed, the source

29

of Patricia's strangulation testimony was *defendant herself*, who also told Patricia she had "dropped off" Mehria's body "somewhere out in Lakeside." The record shows as a result of this information, the search for Mehria was refocused and her body was ultimately found in *Lakeside* on October 2.

In addition, as already noted, the record shows that defendant's boyfriend worked on bicycles *and* that there were multiple bicycle inner tubes in the garage of Mehria's house, where defendant and her boyfriend lived in a makeshift room, and in Mehria's car, which defendant drove. On this record, we thus conclude a reasonable jury could rely on Patricia's testimony concerning the manner in which defendant killed Mehria to infer the killing was so particular and exacting that defendant must have intentionally killed according to a " 'preconceived design' to take [her] victim's life in a particular way for a 'reason' which the jury can reasonably infer" from facts of the case. (See *Anderson*, *supra*, 70 Cal.2d at p. 27.)

B. *Evidentiary Rulings*

Defendant next contends the trial court prejudicially erred when it admitted evidence (1) Mehria was afraid of defendant; (2) defendant abused Mehria physically; and (3) defendant had a "bad character."[3] Defendant contends that this evidence "had

---

3    Evidence in category (3) related to testimony by defendant's cousin, Satara Moosa (Moosa), that even as a child defendant was "negative" and "aggressive." In context, the record shows Moosa gave this testimony when discussing the relationship between defendant and Mehria. Moosa noted that in the past she had tried to talk to defendant about what defendant "could have done with her life," because defendant was "so smart," "so amazing" and "so loved" by her family, including by her parents. Moosa also testified that she and another family member took defendant out to dinner in the days after Mehria went missing, but before Mehria's body was found, and that during dinner defendant recalled an incident when they were all younger while playing on a "rocking horse." Defendant reminded Moosa that defendant had gotten in trouble after they had

30

little or no relevance"; that the admission of these three categories of evidence merely "served to make jurors dislike [her] because she was a bad woman"; and thus, that jurors did not convict her based on the evidence. "We review a trial court's rulings on the admission and exclusion of evidence under the abuse of discretion standard." (*People v. Thompson* (2010) 49 Cal.4th 79, 128.)

With respect to categories (1) and (2), we conclude this evidence was relevant on the issues of deliberation and premeditation. Evidence—and the inferences to be drawn from it—that Mehria was afraid of defendant and that defendant both verbally and, shortly before killing Mehria, physically abused her mother, as Patricia testified, shed light on the nature of, and the turmoil in, their relationship and supported the finding that their relationship was continuing to deteriorate, thus providing one possible motive for the killing.

Indeed, the record shows the day before the murder that Mehria was stressed, sad and depressed. The record also shows that Mehria's house, which she always kept clean and meticulous and which was a source of pride, was then dirty, untidy, full of trash and in "shambles" as a result of defendant and her boyfriend living on the property. The record also shows on the day of the murder, defendant told Sykes she was angry and frustrated over her troubled relationship with Mehria, noting they were arguing "all the time." And even *after* the murder, the record shows defendant continued to express anger and frustration regarding her mother, including when defendant complained to Gomez—

---

fallen off the horse, and then for the first time told Moosa that in response, defendant " 'peed in the fish bowl' " to get " 'revenge' " against Moosa. The record also shows Moosa discussed how as a child defendant would "pull off the head" of Barbie dolls.

while Mehria was still missing—that the "bitch" had taken defendant's "puppy" to the animal shelter a few months earlier.

As noted *ante*, from such evidence a reasonable jury could infer that Mehria's killing was intentional, as Mehria hated her mother, rather than a result of a rash or impulsive act. (See *Anderson*, *supra*, 70 Cal.2d at p. 27; see also *Eggers*, *supra*, 30 Cal.2d at p. 686.) We thus conclude the court did not abuse its discretion and thus err when it admitted the evidence in categories (1) and (2).

In any event, even *if* we assumed the admission of the evidence in categories (1), (2) *and* (3) was error, we nonetheless conclude that error was harmless. It is axiomatic that prejudice from the erroneous admission or exclusion of evidence is reviewed under the standard announced in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325 (*Bradford*.) Under that standard, the conviction will be reversed only if it is reasonably probable that an outcome more favorable to the defendant would have resulted in the absence of the error. (*Ibid.*)

Here, as summarized *ante*, there is overwhelming evidence of guilt and more than sufficient evidence (excluding the evidence in categories 1, 2, and 3) to support defendant's conviction for first degree premeditated murder, including defendant's own admission that she killed Mehria by using a bicycle inner tube after Mehria sustained "visible injuries" during an argument with defendant. As such, we conclude any error in admitting the evidence in categories (1), (2) *and* (3) was harmless because a different result was not reasonable probable.[4] (See *Bradford*, *supra*, 15 Cal.4th at p. 1325.)

---

[4] In any event, to the extent defendant claims the jury convicted her not based on the evidence but instead because she was a "bad woman" and uses the evidence in categories

C. *Jury Instructions*

1. Provocation

Defendant next contends the standard instruction on provocation, CALCRIM No. 522, was erroneous because it allegedly "failed to explain how provocation related to premeditation and deliberation" and because it allegedly "failed to explain that, once there was evidence of provocation, the prosecution bore the burden of proving the absence of provocation beyond a reasonable doubt."

The court instructed the jury with CALCRIM Nos. 521 and 522. Specifically, it instructed the jury as follows with CALCRIM No. 521, first degree murder:

"The defendant has been prosecuted for first degree murder under one theory: (1) the murder was willful, deliberate, and premeditated. [¶] You may not find the defendant guilty of first degree murder unless all of you agree that the People have proved that the defendant committed murder. [¶] The defendant is guilty of first degree murder if the People have proved that she acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if she intended to kill. The defendant acted *deliberately* if she carefully weighed the considerations for and against her choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if she decided to kill before completing the act[s] that caused death.

---

(1), (2) and (3) to support this claim, we note there is ample *other* evidence in the record that defendant does *not* challenge that in our view tended to cast defendant in a similar, if not darker, light, than the evidence in categories (1), (2), and (3). In making this point, we mean no disrespect to defendant. Instead, our intention is merely to show the admission of any evidence in categories (1), (2) and (3), even if error, was, on this record, harmless because absent such evidence, a different result was not reasonably probable.

33

"The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

"The requirements for second degree murder based on express or implied malice are explained in CALCRIM No. 520, *First or Second Degree Murder With Malice Aforethought*.

"The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder."

The court as noted also instructed the jury as follows with CALCRIM No. 522, provocation:

"Provocation may reduce a murder from first degree to second degree. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

As defendant's recognizes, this court in *People v. Hernandez* (2010) 183 Cal.App.4th 1327 (*Hernandez*) addressed a similar contention to the one she makes here. Briefly in *Hernandez,* the defendant was convicted of first degree murder under a

34

premeditation and deliberation theory. The defense theory of the case was that the defendant shot and killed the victim in either reasonable self-defense, supporting acquittal, or in unreasonable self-defense, supporting a voluntary manslaughter conviction. The defendant also requested, and the court gave, an instruction on provocation to support a conviction for second, rather than first, degree murder. (*Id.* at p. 1331.)

Much like defendant in the instant case, the defendant in *Hernandez* asserted that CALCRIM No. 522 was incomplete and misleading because among other reasons it failed to specify that provocation could "negate the premeditation and deliberation necessary for first degree murder." (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1331.) In rejecting this assertion, we stated: "In [*People v.*] *Rogers* [(2006) 39 Cal.4th 826 (*Rogers*)], the court evaluated the potential for error when the jury is instructed on provocation as it relates to voluntary manslaughter, but is not instructed on provocation as it relates to second degree murder. [Citation.] The *Rogers* court concluded that the omission of a provocation instruction for second degree murder is not misleading. The court reasoned that 'the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder' and the manslaughter instruction 'does not preclude the defense from arguing that provocation played a role in preventing the defendant from premeditating and deliberating; nor does it preclude the jury from giving weight to any evidence of provocation in determining whether premeditation existed.' [Citation.] [¶] As reflected in *Rogers,* the fact that a trial court is not required to instruct on provocation for second degree murder *at all* supports that it is not misleading to instruct on provocation without explicitly stating that provocation can negate

premeditation and deliberation.  Although CALCRIM No. 522 does not expressly state provocation is relevant to the issues of premeditation and deliberation, when the instructions are read as a whole there is no reasonable likelihood the jury did not understand this concept.  Based on CALCRIM No. 521, the jury was instructed that unless defendant acted with premeditation and deliberation, [the defendant] is guilty of second, not first, degree murder, and that a rash, impulsive decision to kill is not deliberate and premeditated.  Based on CALCRIM No. 522, the jury was instructed that provocation may reduce the murder to second degree murder.  [¶]  In this context, provocation was not used in a technical sense peculiar to the law, and we assume the jurors were aware of the common meaning of the term.  [Citation.] . . .  Considering CALCRIM Nos. 521 and 522 together, the jurors would have understood that provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation."  (*Id.* at p. 1333–1334.)

Our court in *Hernandez* expressed satisfaction "that, even without express instruction, the jurors understood that the existence of provocation can support the absence of premeditation and deliberation."  (*Hernandez, supra,* 183 Cal.App.4th at p. 1334.)  Thus, we concluded that without a request for further instruction, the court was not required to amplify the instructions given.  (*Ibid.*)

We agree with the holding and reasoning of *Hernandez.*  Because the jury in the instant case was instructed with CALCRIM Nos. 521 and 522, the instructions when read as a whole informed the jurors that first degree murder required premeditation and deliberation, that all other murders were second degree murders, and that the jury could consider whether defendant was provoked in determining the degree of murder.  We thus

36

are satisfied the jurors would have understood that provocation could negate the elements of premeditation and deliberation and thereby reduce first degree murder to second degree murder. (See *People v. Carrington* (2009) 47 Cal.4th 145, 192 [noting the " 'correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction' "].)

We also reject defendant's contention that the court erred when it did not instruct the jury it was the prosecution's burden to prove absence of provocation beyond a reasonable doubt. The record shows not once in closing did the defense mention provocation or CALCRIM No. 522. And for good reason.

As noted *ante*, defendant testified in her own defense that she *accidently* knocked Mehria down while opening the bathroom door; that when defendant left the house about 8:20 a.m. on Tuesday, September 24, Mehria claimed to be "fine"; and that defendant found Mehria dead about noon that same day when defendant went home to check on Mehria. Moreover, during closing argument, the defense aggressively argued that Mehria's death was an accident.[5]

Thus, defendant's own testimony and the defense's theory of the case were that Mehria died as a result of a tragic accident and not because defendant was provoked and killed her mother in the heat of passion. (See *Hernandez*, *supra*, 183 Cal.App.4th at p.

---

[5] The record shows during closing the defense argued in the alternative that if the jury rejected that Mehria died from an accident, that it nonetheless should return a not guilty verdict because there allegedly was no evidence of who killed Mehria. The defense also argued in closing that there was no evidence of willfulness, premeditation and deliberation because "we don't even know how [Mehria] died" and because the medical expert allegedly could not find any evidence of strangulation. As such, the defense argued the jury at most could return a verdict of second degree murder.

37

1334 [noting provocation "means 'something that provokes, arouses, or stimulates' . . . [or] means 'to arouse to a feeling or action' . . . [or means] 'to incite to anger' "]; see also *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295-1296 [noting that to reduce a murder to second degree murder, premeditation and deliberation may be negated by heat of passion arising from provocation and noting that if the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder].)

For this same reason, we also conclude that even if the court erred when it failed sua sponte to instruct the jury that the prosecution had the burden to prove absence of provocation beyond a reasonable doubt, any such error was harmless because it was not reasonably probable the jury would have returned a verdict more favorable to defendant. (See *Watson*, *supra*, 46 Cal.2d at p. 836; see also *People v. Eid* (2010) 187 Cal.App.4th 859, 883 (*Eid*) [noting that "[i]n determining whether instructional error was harmless, . . . [a] reviewing court considers 'the specific language challenged, the instructions as a whole[,] the jury's findings' [citation], and counsel's closing arguments to determine whether the instructional error 'would have misled a reasonable jury . . .' "].)[6]

2. Premeditation

Defendant next contends CALCRIM No. 521, the standard first degree murder instruction, failed to define premeditation properly because it merely provided, in part,

---

[6]    In light of our decision, we deem it unnecessary to reach respondent's alternate contention that defendant's failure at trial to request additional or clarifying instructions with respect to CALCRIM No. 522 resulted in a forfeiture of this issue on appeal.

that defendant "acted with premeditation if she decided to kill before completing the act[s] that caused death." We disagree.

First, considering the instructions as a whole and assuming the jurors are intelligent persons capable of understanding and correlating all the instructions, as we must (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1332), we conclude the instructions did not allow the jury to find premeditation based merely on an intent to kill. Rather, under CALCRIM No. 521, the jury was properly instructed that defendant could be guilty of first degree murder if the People have proved that she acted "willfully, deliberately, *and* with premeditation" (italics added); that she "acted *willfully* if she intended to kill"; that she "acted *deliberately* if she carefully weighed the considerations for and against her choice and, knowing the consequences, decided to kill"; *and* that she "acted with *premeditation* if she decided to kill before completing the act[s] that caused death."

What's more, the jury was also instructed that the "length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated"; that the "amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances"; and that a "decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." However, the jury was also instructed that "a cold, calculated decision to kill can be reached quickly," and that the "test is the extent of the reflection, not the length of time." Taken as a whole, we conclude CALCRIM No. 522 was a proper instruction of first degree premeditated murder.

Second, we conclude that, even if the court erred when it failed sua sponte to further instruct the jury regarding the meaning of premeditation, we conclude any such

39

error was harmless because as noted *ante*, there is substantial evidence in the record to support a finding of first degree premeditated murder, including planning activity, the manner of killing by defendant and a "motive" to kill that would in turn support an inference that the killing resulted from a " 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed.' " (See *Anderson*, *supra*, 70 Cal.2d at p. 27.) Thus, we conclude on this record it was not reasonably probable the jury would have returned a verdict more favorable to defendant even if the court had further instructed the jury regarding the meaning of deliberation. (See *Watson*, *supra*, 46 Cal.2d at p. 836; see also *Eid*, *supra*, 187 Cal.App.4th at p. 883.)[7]

## DISPOSITION

The judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

McINTYRE, J.

O'ROURKE, J.

---

[7] In light of our conclusion that there were no errors—or even assuming any such errors, that they were harmless—we further conclude the "cumulative error doctrine" does not apply in this case.